**Albert GARZA, Jr., Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 04–81–00162–CR.**

Court of Appeals of Texas,
San Antonio.

Aug. 31, 1984.

Rehearing Denied Sept. 28, 1984.

Richard C. Mosty, Pollard, Pollard & Mosty, Kerrville, for appellant.

Scott Stehling, Asst. Dist. Atty., Kerrville, for appellee.

Before CADENA, C.J., and CANTU and REEVES, JJ.

## OPINION

CADENA, Chief Justice.

A jury found appellant guilty of burglary of a habitation and sentenced him to 75 years' imprisonment.

Appellant argues that the trial court should have excluded the testimony of Daniel Valadez and Raymundo Rodriguez because the identity of these two witnesses and the nature of their testimony became known to the police solely as the result of the illegal stop of his vehicle and his arrest by William Ragsdale, a deputy sheriff of Kendall County.

Appellant was stopped, questioned and arrested by Ragsdale in the City of Boerne, in Kendall County. At the time of the stop, Valadez was a passenger in appellant's car.

Prior to the date of the stop and arrest, there had been several burglaries in a subdivision lying partly in Kendall County and partly in Bexar County. Ragsdale had been told by a Bexar County deputy sheriff that Bexar County officials believed that a

person named Albert Garza, Jr., was "good for" such burglaries. Ragsdale had seen a mug shot of Garza and had received a description, including the license plate number, of Garza's automobile. Ragsdale had been told by a Boerne merchant that he had seen two "Mexican-American males" parked near the merchant's storage building some days previously, and that the two men had acted in a "peculiar" manner, which caused the merchant to suspect that they were planning a burglary of the storage building. At the time of the stop and arrest of appellant several days later, no such burglary had occurred. According to Ragsdale, appellant matched the description which the merchant had given of the driver of the car.

Several days later Ragsdale, while on patrol, saw a car leaving Interstate Highway 10 at the Boerne exit. The vehicle matched the description of Garza's car and bore the license number of Garza's car. There were two men in the car and Ragsdale, although he was unable to form a definite opinion, thought that the driver resembled the man pictured on the mug shot of Albert Garza.

Ragsdale followed the vehicle and informed other officers, by radio, that he was about to stop a man he believed to be Albert Garza. Ragsdale turned on the flashing lights of his vehicle, and when appellant came to a stop, Ragsdale parked his vehicle next to the driver's side of appellant's car. By the time Ragsdale left his car and approached appellant, four other officers had arrived to "back up" Ragsdale. At the time that Ragsdale began to question appellant, one or more of the other officers removed the passenger, Valadez, from appellant's vehicle and engaged him in conversation a short distance away.

In answer to Ragsdale's first question, appellant identified himself as Alberto Garza, Jr. Although this confirmed Ragsdale's belief that appellant was Albert Garza, Ragsdale was not satisfied. When the officer demanded further proof, appellant produced birth and baptismal certificates reflecting that he was Albert Garza.

Ragsdale remained dubious because the documents did not bear Garza's picture, bore marks of "obliteration," and he "knew" that such documents were easily falsified. When, at Ragsdale's demand, appellant was unable to produce a driver's license, Ragsdale arrested him for driving without a license. The charge filed against appellant for not having a valid license gave his name as Albert Garza.

Appellant and Valadez were taken to the sheriff's office in separate vehicles. A search of the trunk of appellant's car revealed a number of items taken in recent burglaries. Appellant and Valadez never saw each other again until Valadez testified at appellant's trial.

Valadez told Kendall County officials that six days before the arrest, he had been with appellant when appellant entered a mobile home, while Valadez waited in appellant's car, and the appellant had emerged carrying a television set and some guns. According to Valadez, he and appellant then drove to San Antonio, where appellant stopped at a tire shop and sold the television set and guns to Raymundo Rodriguez, the owner of the tire shop. Valadez later accompanied officers to the Rodriguez tire shop in San Antonio where the officers recovered the guns and television set which were identified by Charles Decherd, the complaining witness in this case, as items which had been taken from his mobile home during the burglary in question.

At appellant's trial, Valadez and Rodriguez testified to facts as related to the officers by Valadez.

Appellant contends that but for the unlawful action of Ragsdale in stopping, detaining and arresting appellant in violation of the federal and state constitutions, the State would not have gained access to the testimony of Valadez and Rodriguez and that, therefore, the testimony of these two witnesses should have been excluded.

The State does not contend that, at the time he stopped appellant, Ragsdale had probable cause to arrest appellant for any offense. The State's argument is that Ragsdale had an "articulable suspicion"

justifying a brief detention for the purpose of determining appellant's identity.

■ A police officer who detains a person for further investigation must justify his action by pointing "to specific and articulable facts which, taken together with rational inferences from such facts, reasonably warrant that intrusion" upon the constitutional rights of the person so detained. *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968). A detention is permissible if the officer reasonably suspects that some activity out of the ordinary is occurring or has occurred, that some suggestion exists to connect the person detained with such activity, and that there is indication that the activity is related to crime. *Terry, supra.*

■ Prior to the time he stopped appellant, Ragsdale had observed no violation of any law; he observed nothing which might be classified as evidence that an offense was being committed or had been committed; and he saw nothing which suggested that any illegal activity was about to take place. As the Court said in *Armstrong v. State*, 550 S.W.2d 25 (Tex.Crim.App.1976) (opinion on State's motion for rehearing 1977), the actions of the officer can accurately be described as "just the sort of fishing expedition the Fourth Amendment and Article I, Sec. 9 of the State constitution were designed to prohibit."

■ In *Leonard v. State*, 496 S.W.2d 576 (Tex.Crim.App.1973), it was said that the stop of a vehicle to permit an officer to determine whether the driver has a valid operator's license does not violate the rights of the driver. But the evidence in this case conclusively establishes that Ragsdale did not stop appellant to determine if he had a driver's license. In any event, the *Leonard* holding is incorrect. Stopping a vehicle and detaining the driver in order to check his driver's license and the registration of vehicle is "unreasonable" under the Fourth Amendment "except in those situations in which there is at least articulable suspicion that a motorist is unlicensed or that the automobile is unreg-

istered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law . . . ." *Delaware v. Prouse*, 440 U.S. 648, 663, 99 S.Ct. 1391, 1401, 59 L.Ed.2d 660 (1979).

■ The fact that appellant was, in fact, unlicensed, is irrelevant. The unconstitutional intrusion cannot be justified retroactively by the evidence uncovered as a result of the intrusion on constitutional rights. *Brown v. State*, 481 S.W.2d 106, 112 (Tex.Crim.App.1972).

■ The State seeks to justify Ragsdale's actions because he was acting on information he had received through police channels. The first thing to be noted in discussing this claim is that Ragsdale's action was not in response to a bulletin calling for appellant's arrest. Where a police bulletin calls for the arrest of certain person, it can persuasively be argued that the stop of a person resembling the person to be arrested for the purpose of determining whether he is actually the wanted person is reasonable. *United States ex rel. Kirby v. Sturges*, 510 F.2d 397, 400 (7th Cir.1975).

The information which Ragsdale had received through police channels was as follows:

1. A Bexar County deputy sheriff thought appellant "might be good for" some burglaries.

2. Appellant had been seen in the area where some burglaries had occurred, and Bexar County officers "felt" he might have been checking to determine whether the occupants of residences might be away from home.

3. A Bexar County deputy had stopped appellant and had found that appellant was in possession of heroin.

4. A computer print-out showed that appellant was a dope addict.

To Ragsdale, the important information was that contained in the print-out from some unidentified computer reflecting that appellant was a dope addict. He testified: "Almost every burglar is a dope addict. That's a fact that goes without saying be-

cause of the extreme high price of the habit."

■ The record does not support the conclusion that the Bexar County deputy sheriff who was Ragsdale's informant had in his possession articulable facts "which, taken together with reasonable inferences drawn from such facts," would "reasonably warrant" stopping appellant. There is nothing to indicate that appellant, when seen in the area of some burglaries, had been acting suspiciously. Perhaps this explains why there is no evidence that Bexar County officers had stopped appellant to investigate his presence in the area. There is no evidence tending to show the temporal relation between the observation of appellant in the area of the burglaries and the actual occurrence of any burglaries. The total information, then, was merely that appellant, a dope addict according to a computer print-out, had been seen at some unspecified times in an area where some unspecified burglaries had been committed at some unspecified times.

■ Such vague and meager "information" could not, merely by being relayed to Ragsdale by the Bexar County deputy, be converted into "articulable facts" sufficient to justify the stop of appellant by Ragsdale.

The only other evidence available to Ragsdale when he stopped appellant was that a Boerne merchant, having seen a man, presumably appellant, near the merchant's storage building, had formed the suspicion that the man was planning on burglarizing the building. As already pointed out, there is no evidence that the building was, in fact, ever burglarized. There is no evidence that, when arrested, appellant was near the storage building, or, in fact, that he had ever again been near the building.

The stop, detention and arrest of appellant by Ragsdale was in violation of appellant's rights under the United States and Texas Constitutions.

At the time that he stopped appellant, Ragsdale did not know who appellant's passenger, Valadez, was. He had never heard of Valadez and had no reason to stop him and question him. No officer was aware of the existence of Valadez or of his relationship with appellant. The same is true of the other witness, Rodriguez, the fence. There is nothing in the record to suggest that the identity of these two witnesses would inevitably have been discovered by independent and legal means.

■ Where the testimony of a witness is uncovered as the result of illegal police activity, such evidence has been illegally obtained. *Wong Sun v. United States*, 371 U.S. 471, 486, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963).

In *United States v. Ceccolini*, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978), defendant's flower shop had been under surveillance by the FBI in connection with a federal investigation into gambling activities. The surveillance was eventually discontinued, although the investigation continued and, apparently, the "tap" on defendant's telephone was not terminated. About a year after the termination of the surveillance, a city policeman entered the flower shop during his "break" to chat with his friend, Lois Hennessy, defendant's employee. He noticed and picked up an envelope lying on the cash register. He opened the envelope and discovered that it contained cash and some policy slips. In answer to the officer's questions concerning the contents of the envelope, Hennessy replied that that defendant had given her the envelope with instructions to deliver it to someone. The officer did not confiscate the envelope but later recounted the incident to a city detective who, subsequently, told an FBI agent of the incident.

About four months later the federal agent visited Hennessy at her home and, without mentioning the envelope incident, told her he would like some information about her employer. Hennessy said she would help in the investigation because she was studying police science in college. She gave information to the federal officer, including a reference to the discovery of the

envelope and its contents by the friendly police officer.

When Ceccolini was called before a grand jury, he denied any participation in gambling activities. He was indicted for perjury and convicted on the basis of Hennessy's testimony.

In a majority opinion, Mr. Justice Rehnquist rejected the "Government's suggestion that we adopt what would in practice amount to a per se rule that the testimony of a live witness should not be excluded at trial no matter how close and proximate the connection between it and a violation of the Fourth Amendment." 435 U.S. 274, 98 S.Ct. 1059. The majority expressly reaffirmed the *Wong Sun* holding that "verbal evidence which derives so immediately from an unlawful entry and unauthorized arrest as the officer's action in the present case is no less the 'fruit' of official illegality than the more tangible fruits of the unwarranted intrusion." *Id.* at 275, 98 S.Ct. at 1059.

In his concurring opinion the Chief Justice, although he expressed the view that the testimony of a witness should never be excluded if it meets the "traditional evidentiary requirements," 435 U.S. at 285, 98 S.Ct. at 1065, did not challenge the conclusion that the evidence had been illegally obtained. In his dissenting opinion, joined by Mr. Justice Brennan, Mr. Justice Marshall would have excluded the testimony since it was obtained as the result of illegal police activity. 435 U.S. at 290, 98 S.Ct. at 1067.

Although the holding in *Ceccolini* was that the evidence was admissible because the connection between the search and Hennessy's testimony was so attenuated as to dissipate the "taint" of the illegal search, all eight Justices who participated in the decision agreed that the testimony of the witness was discovered as the result of illegal police activity.

Our determination of the admissibility of the testimony of Valadez and Rodriguez in this case in no way depends on the *Ceccolini* holding concerning the scope of the federal exclusionary rule. The only relevant portion of *Ceccolini*, as far as the disposition of this case is concerned, is the unanimous agreement of the Justices that the testimony of the witness was obtained as a result of an illegal search.

■ The Fourth Amendment makes no reference to the admission or exclusion of evidence and the federal exclusionary rule, insofar as it is applicable to the states, rests on the interpretation of that amendment by the Supreme Court.

■ When the Supreme Court holds that certain evidence is inadmissible because it was illegally obtained, state courts are clearly bound by such holding. But when that court determines that the admission of certain evidence is not prohibited by the United States Constitution, a state court is free to make its independent determination whether such evidence is admissible under state exclusionary rules. A decision by a state court that evidence illegally obtained is inadmissible under the state's exclusionary rules is not a refusal to acknowledge that the Fourth Amendment, as applicable to the states, is the supreme law of the land, nor does such a state court decision conflict with a pronouncement by the Supreme Court that the exclusion of such evidence is not mandated by the United States Constitution.

In 1925, 36 years before *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), our legislature decreed that no evidence obtained in violation of the Constitution and laws of the State of Texas, or of the United States, "shall be admitted in evidence against the accused on the trial of any criminal case." TEX.CODE CRIM. PROC.ANN. art. 727a (Vernon 1925). This was the forerunner of our present article 38.23, TEX.CODE CRIM.PROC.ANN. (Vernon 1979), which provides:

No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted into evidence against

the accused on the trial of any criminal case.

In any case where the evidence raises an issue hereunder, the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of this Article, then, and in such event, the jury shall disregard any such evidence so obtained.

It is clear that even if the Supreme Court should overrule *Mapp*, the obligation of Texas courts to exclude evidence obtained in violation of the United States or Texas Constitutions would still exist. Our Court of Criminal Appeals has squarely held that article 38.23 requires the exclusion of illegally obtained evidence under the circumstances in which the Supreme Court has held that the federal exclusionary rule is inapplicable. *Martinez v. State*, 498 S.W.2d 938 (Tex.Crim.App.1973).

As already pointed out, the language of the Fourth Amendment does not purport to establish rules relating to the admission and exclusion of evidence. The federal exclusionary rule, although it rests on an interpretation of the Fourth Amendment, is based on policy considerations deemed important by the Supreme Court, and not on any specific language of the Fourth Amendment. Under these circumstances, the Supreme Court has not hesitated to place limits on the extent to which such policy considerations dictate that illegally obtained evidence be excluded. The majority opinion in *Ceccolini* expressly recognizes that the Supreme Court is relatively free to limit the application of the federal exclusionary rule. As Mr. Justice Rehnquist said in that case:

In *Stone v. Powell*, 428 U.S. 465, 486 [96 S.Ct. 3037, 3048–49, 49 L.Ed.2d 1067 (1976)] ..., we observed that "despite the broad deterrent purpose of the exclusionary rule, it has never been interpreted to proscribe the introduction of illegally seized evidence in all proceedings or against all persons." Recognizing not only the benefits but the costs, which are often substantial, of the exclusionary rule, we have said that "application of the rule has been restricted to those areas where its remedial objectives are thought most efficaciously served," *United States v. Calandra*, 414 U.S. 338, 348 [94 S.Ct. 613, 620, 38 L.Ed.2d 561 (1974)] ... In that case, we refused to require that illegally seized evidence be excluded from presentation to a grand jury. We have likewise declined to prohibit the use of such evidence for the purpose of impeaching a defendant who testifies in his own behalf.

435 U.S. at 275, 98 S.Ct. at 1060.

Such an approach, of course, is but an application of the "balancing test" now so fashionable in the area of constitutional interpretation. It is, perhaps, uniquely appropriate in considering the reach of the federal exclusionary rule, since such rule was "read" into the Fourth Amendment as a means of deterring official misconduct. Where the exclusion of the evidence would have little or no effect on future police action, a refusal to apply the exclusionary rule may be defended on the theory that exclusion would result in a gratuitous harm to government's interest without appreciably deterring future intrusion upon personal security.

The Texas courts, however, are not free to "balance" for the purpose of restricting the scope of our exclusionary statute. As pointed out in *Ceccolini*, the federal rule does "not proscribe the introduction of illegally seized evidence in all proceedings or against all persons." 435 U.S. at 275, 98 S.Ct. at 1060. The Texas statute, on the other hand proscribed the introduction of such evidence "against the defendant in the trial of any criminal case." All defendants, in all criminal cases are protected against the introduction of evidence obtained in violation of their constitutional rights.

The federal exclusionary rule has been described as a "medicament" which is "grudgingly taken," so that "no more should be swallowed than is necessary to combat the disease." Amsterdam, *Search, Seizure, and Section 2255: A Comment,*

112 U.PA.L.REV. 378, 379 (1964). Since, insofar as the federal rule is concerned, the Supreme Court is the prescribing physician insofar as the administration of the federal exclusionary rule is concerned, it may properly determine the size of the dosage and, in a given case, decide that the disease is so insignificant that no "medicament," in the form of exclusion of evidence, shall be "swallowed."

In Texas, the Legislature, in unambiguous language, has prescribed that in all cases the full dosage, exclusion of the illegally obtained evidence, must be swallowed. Texas courts are not free to decide whether, or how much, of the medication shall be taken.

Our Legislature has made the police determination that all illegally obtained evidence must be excluded. Arguments such as those urging that, in certain situations, the federal exclusionary rule should not be applied, must, in Texas, be directed to the Legislature in an attempt to persuade that body to amend or repeal the statute which prohibits the admission of illegally obtained evidence.

 There can be no doubt that the evidence of which appellant complains was obtained in violation of the United States Constitution. *Ceccolini* makes it clear that the testimony of the witness in that case was obtained as the result of illegal police activity. This conclusion, based on the Fourth Amendment, is binding on Texas courts and precludes a holding that the evidence in this case was not obtained in violation of the United States Constitution. Our statute mandates its exclusion.

It is our intention to base our holding concerning the admissibility of the evidence in question solely on state exclusionary rules, without reference to, or reliance on, the manner in which the Supreme Court of the United States applies the federal exclusionary rule.

In any event, even if we were disposed to apply *Ceccolini* to the question of admissibility, that decision does not require the admission of the testimony of which appellant complains.

In applying the federal exclusionary rule, Mr. Justice Rehnquist said that in cases involving the testimony of a witness, the "length of the road" leading from the illegal police activity to the witness was a factor to be considered, along with other circumstances. 435 U.S. at 273–74, 98 S.Ct. at 1058–59. He then enumerated five "other factors" which should be considered, although, as will appear from our discussion, one of these "other factors" includes a consideration of the "length of the road." We will consider these other factors and compare the facts in *Ceccolini* to the facts in this case.

1. *The voluntary nature of the testimony.* The Rehnquist opinion points out that the evidence in *Ceccolini* "overwhelmingly" indicated that the testimony given by the witness was the act of her own free will "in no way coerced or even induced by official authority as a result" of the "discovery of the policy slips." 435 U.S. at 279, 98 S.Ct. at 1062. In this case there is no evidence which, "overwhelmingly" or otherwise, indicates that the testimony given by Valadez and Rodriguez resulted from an act of their own free will. Hennessy was a student of police science and her interest in that subject made her eager to participate and assist in a police investigation. Valadez was 17 years of age and a seventh-grade dropout, and there is no evidence that he had any interest in police science or in any other subject such as would cause him to be waiting for an opportunity to assist the police. The same is true of Rodriguez. Their cooperation with the police, instead of helping them in any subject which they were studying would, instead, necessarily incriminate and place them in a difficult position. Cooperation prompted only by a desire to aid the police would necessarily expose both Rodriguez and Valadez to prosecution.

Hennessy was questioned in her home. Valadez was questioned in the sheriff's office minutes after the car in which he was a passenger was stopped and literally sur-

rounded by at least five officers. His testimony that he was arrested before being taken to the sheriff's office is not contradicted.

2. *Use of illegally obtained evidence in questioning the witness.* The illegally obtained policy slips in *Ceccolini* were, according to the evidence, not used in questioning Hennessy. In this case the police, after arresting appellant, illegally searched the vehicle and, apparently, found some items which had been taken in recent burglaries. There is no evidence which even tends to show that the officers, in questioning Valadez, did not refer to such evidence. Insofar as Rodriguez is concerned, when the police arrived at his tire shop, they were accompanied by Valadez who, according to all of the evidence, had told the police of appellant's connection with Rodriguez and the transaction involving the sale of stolen property by appellant to Rodriguez. Valadez was present at the time Rodriguez bought the stolen items from appellant. The evidence at least suggests that when Rodriguez was questioned by the officers he was aware that Valadez had told them of the relationship between Rodriguez and appellant. In any event, the evidence in this case does not establish that any illegally obtained evidence was not used in the police interrogation of Valadez and Rodriguez.

3. *Interval between the illegal police action and contact with the witness.* In *Ceccolini,* four months elapsed between the illegal police activity and police contact with the witness. In this case, as far as Valadez is concerned, police contact with Valadez was initiated immediately after, if not at the same time, as the illegal stop of appellant. As far as Rodriguez is concerned, police contact with him took place shortly after the police obtained the testimony of Valadez.

Mr. Justice Rehnquist, in speaking of temporal connection, points to the lapse of time between the illegal police activity and the time the testimony was given at trial. It is difficult to consider this factor as having any great importance, since in every case there would be a significant lapse of time between the illegal police activity and the time at which the testimony was given at trial. Everybody, including Justices of the Supreme Court of the United States, knows that criminal trials move slowly. There is no great likelihood that a witness who has given a statement to the police will subject himself to prosecution for perjury or false swearing when called to the stand at the trial of the case in connection with which the statement was made shortly after the illegal police activity. The reference in *Ceccolini* to the lapse of time between the illegal police activity and the time the testimony was actually given at the trial appears to be nothing more than a "make weight" after thought, the weight of which has been grossly exaggerated. The testimony given by Rodriguez and Valadez in this case was not prompted by considerations which resemble even slightly the eagerness of the police science student in *Ceccolini* to testify. It is doubtful if the lapse of time between the illegal police activity and the trial in this case can be used as a basis for the conclusion that the witness voluntarily chose to testify.

4. *Police knowledge, prior to the illegal police activity, of the identity of the witnesses and their relationship to the accused.* In *Ceccolini,* the identity of Lois Hennessy and her relationship to the defendant was well known to the officer investigating the case prior to the illegal conduct of the friendly policeman. 435 U.S. at 279, 98 S.Ct. at 1061–62. This knowledge predated the illegal activity by at least several months. In the case before us, the police were entirely ignorant of the identity of Valadez and Rodriguez and their relationship to appellant. In *Ceccolini,* there was, at the very least, a strong probability that the officers would, eventually, question the employee, Lois Hennessy, since they knew that a prime suspect made frequent regular visits to defendant's shop. In our case there is no evidence of any possibility that the police would ever have questioned Valadez or Rodriguez.

5. *Subjective intent of the police.* The *Ceccolini* opinion emphasizes the complete absence of evidence to suggest that the city policeman "entered the shop or picked up the envelope with the intent of finding tangible evidence bearing on an illegal gambling operation, much less any suggestion that he entered the shop and searched with the intent of finding a willing and knowledgeable witness against respondent." 435 U.S. 280, 98 S.Ct. 1062. Of course, the evidence showed that the policeman entered the shop for the purpose of having a friendly chat with Lois Hennessy. But the critical inquiry does not concern the purpose for which he entered the shop. Why did he pick up the envelope and open it? We should, perhaps indulge the presumption that city policemen are insatiably curious and cannot resist the urge to pick and examine the contents of envelopes which they find lying on cash registers in flower shops, particularly when the owner of the shop is being investigated for illegal gambling activities.

In this case, Ragsdale testified that he merely wished to determine appellant's identity. The fact that, before stopping appellant, he called for assistance is somewhat suggestive, particularly in view of the fact that the evidence does not suggest that he had any information which might lead him to believe that appellant was dangerous. Not even the cooperative Bexar County deputy sheriff hinted that appellant was usually armed or otherwise dangerous.

This case, then, differs from *Ceccolini* because:

1. The road leading from the police activity to the discovery of the witnesses, particularly Valadez, was not lengthy. It was extremely short.

2. There is no evidence that the testimony given by the witnesses was an act of their "own free will." There is no evidence of an eagerness by either witness to cooperate with the police.

3. The identity of the witnesses and their connection with appellant were not known to the police prior to the illegal police activity, nor is there any evidence indicating that their identity would have been discovered by independent legal police activity.

The differences between the facts of this case and those involved in *Ceccolini* are obvious, significant and not to be ignored.[1]

 Appellant's attack on the sufficiency of the evidence must be rejected. In passing on this contention, we examine all of the evidence, including that which was improperly admitted. *Porier v. State,* 662 S.W.2d 602, 603, 606 (Tex.Crim.App.1984).

Valadez testified that on the night in question he and appellant stopped at the residence of the complaining witness. While Valadez waited in the car, appellant left the vehicle with a screwdriver in his hand and walked to the residence. Appellant made four trips to and from the residence carrying, on each trip back to the car, some of the items belonging to the owner of the residence. Valadez did not see appellant enter the residence.

The complaining witness testified that all of the items had been inside his residence on the night in question prior to the burglary. "Pry marks," such as would be made by use of a screwdriver, were found on the door to the building. The articles taken during the burglary were recovered at the tire shop owned by Rodriguez, who had purchased them from appellant only a few hours after the burglary.

 This evidence, if believed by the jury, is sufficient to establish beyond a reasonable doubt that appellant entered the residence and removed the articles in question. *Autry v. State,* 626 S.W.2d 758, 761 (Tex.Crim.App.1982).

Assuming that Valadez was an accomplice to the burglary, it is not true that the conviction of appellant rests solely on the uncorroborated testimony of an accomplice.

1. *See United States v. Dunn,* 674 F.2d 1093 (5th Cir.1982); *United States v. Rubalcava-Montoya,* 597 F.2d 140 (9th Cir.1978); *United States v.*

*Cruz,* 581 F.2d 535 (5th Cir.1978); *Commonwealth v. Cephas,* 447 Pa. 500, 291 A.2d 106 (1972).

The evidence of the complaining witness and the testimony concerning the pry marks on the door sufficiently establish that a burglary was committed. It is not required that an accomplice be corroborated in all of his testimony. The corroboration is sufficient if it connects defendant to the offense and shows that the testimony of the accomplice is more likely true than not. *May v. State*, 618 S.W.2d 333, 340 (Tex.Crim.App.1981). In this case the testimony of Rodriguez, not an accomplice to the burglary, is clearly sufficient to establish that, within a few hours after the commission of the burglary, appellant was in possession of the items taken from the burglarized residence. Such evidence is, at the very last, sufficient to corroborate the testimony of Valadez, since it links appellant with the burglary. *Thompson v. State*, 615 S.W.2d 760 (Tex.Crim.App.1981).

We think it unnecessary to discuss appellant's other points, since it is extremely unlikely that the questions raised by such points will arise on another trial. The questions raised in appellant's *pro se* brief merit no discussion in view of our disposition of this case.

The judgment of the trial court is reversed and the cause is remanded for a new trial.