Noe BELTRAN, Appellant,

v.

The STATE of Texas, Appellee.

No. 68877.

Court of Criminal Appeals of Texas, En Banc.

April 15, 1987.

---

1. See V.T.C.A., Penal Code Sec. 1.07(29) and the dissent by Justice Ashworth.

Jeffrey L. Jackson, Michael J. McNamara, Harlingen, for appellant.

Reynaldo S. Cantu, Jr., Dist. Atty. and Gilbert A. Garcia, Asst. Dist. Atty., Brownsville, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

ONION, Presiding Judge.

This appeal is taken from the conviction of capital murder. V.T.C.A., Penal Code, § 19.03(a)(2). The death penalty was assessed by the court after the jury returned affirmative findings to the two special issues submitted pursuant to Article 37.-071(b)(1) and (2), V.A.C.C.P.

On appeal appellant raises ten points of error, all relating to the penalty stage of trial. He contends the court erred in admitting a probation officer's file which included an FBI "rap sheet," that the court erred in failing to grant a new trial because of jury misconduct, that the evidence was insufficient to sustain the affirmative answer to Special Issue No. 2 submitted under Article 37.071, supra, and that the court erred in failing to receive the jury's verdict, leaving Special Issue No. 2 unanswered.

Although the appellant does not challenge the sufficiency of the evidence to sustain the conviction obtained at the guilt stage of the trial, a recitation of all the facts at the guilt stage of the trial will place the points of error in proper perspective.

The evidence shows that Enrique Arechiga and his wife, Carmen, owned and operated the Disco de Oro Tortilla Factory in Brownsville. Enrique testified that he first noticed the "robber" around 2:20 p.m. on March 4, 1981. At the time his son, Valentin, was standing near the cash box giving change to a customer, while Carmen stood by the counter waiting on customers. Enrique testified that the intruder first pointed a pistol at Valentin, who immediately handed over an unspecified amount of money from the cash drawer. At this point Carmen moved toward the drawer and said, "If that's what he wants, money." According to Enrique, "She opened up the drawer and handed over another bunch of money." Enrique also stated, "When my wife handed him over this second bunch of money, at that same moment the individual fired."

"Q Are you saying she was still in the act of handing the money when he fired?

"A At the same time that she opened up the drawer and throws the money at him, he fires.

"Q How much money do you think was in that cash box at that time?

"A Eighty or sixty dollars in $1 bills."

Valentin testified that he was working at the tortilleria when the appellant entered. He stated that he had noticed a sports car pull up in the alley next to the tortillaria and that shortly thereafter he "saw this man come into the door and pointed a gun and said, 'El dinero!' "

"Q What did he say?

"A He said, 'El dinero!' After that I opened the cash box. I gave him the money.

"After that, my mother gave him some more, and he shot.

"He went out the door that he came in. I tried to run after him.

"I get to the alley but the car had already left.

"I come back in and I see my mother was dead.

"After that, I called the ambulance; the ambulance came and they just took my mother."

Valentin also testified that he saw the appellant jump into the passenger's side of the sports car after the shooting took place. Guadalupe Benavidez, a former employee at the tortillaria, testified that he also observed appellant's escape in the sports car and identified the vehicle.

Both Enrique and Valentin made an in-court identification of the appellant. They also testified that they had previously identified appellant's picture in a photospread, as well as picking him out of a lineup. The lineup was conducted on March 14, 1981. Both men identified the derringer pistol appellant wielded during the robbery. Benavidez testified to substantially the same facts and identified appellant as the victim's assailant.

Guadalupe Rodriguez testified that on March 4, 1981, she was at home sitting on her bed when she heard a noise coming from the tortilla factory. From her window Rodriguez saw a man walk out of the tortillaria and then run towards a red car parked in the alley. She testified that another person drove the vehicle. Rodriguez identified a photograph of the appellant as being the same man who exited the tortillaria and also made an in-court identification of the appellant.

According to the pathologist, Dr. Lawrence Dahm, the deceased died as a result of a gunshot wound to the chest. The doctor testified that the bullet "nicked" the deceased's right lung and struck the aorta, causing it to burst. The destruction of the aorta and the pulmonary artery resulted in extensive hemorrhaging and quickly filled the victim's chest with blood. The bullet exited the deceased's body on the left side of her back. The bullet was found on top of a counter by Raul Villarreal, an emergency medical technician.

Appellant's attorney testified that he had been appointed by the court to represent the appellant. He identified two photographs taken of appellant's left arm showing the absence of the tattooed initials "LX" or "LT," which were supposed to have been on the assailant's upper left forearm according to a composite received into evidence. Defense counsel was the only witness called by the defense before both sides closed.

In his first two points of error appellant contends that the trial court erred in admitting into evidence a probation office file (State's Exhibit No. 30) and more particularly the inclusion therein of an FBI "rap sheet," and in overruling the motion for new trial based on the admission of said exhibit.

Probation Officer Alfonse Lee of Cameron County testified at the penalty stage of the trial he first met appellant in December 1980, after appellant was placed on probation for the felony offense of driving while intoxicated. Lee testified he kept a probation file on appellant, was custodian of the file, made all entries therein and the file had been in his possession since appellant was placed on probation. He stated the entries were made in the normal course of carrying out his duties as a probation officer. It was shown that other probation officers had access to the file and Lee was not always aware who had custody of the file.

Appellant objected to State's Exhibit No. 30 on the ground that much of the information in the file was gross hearsay, had been placed therein by individuals other than Lee who were not available for cross-examination and that a proper predicate had not been laid for the file's admission as a business or official record. See Articles 3731a and 3737e, V.A.C.S., then in effect. The objection was overruled and the exhibit was admitted.

After both sides closed at the penalty stage but before the exhibit was read or delivered to the jury,[1] the appellant objected again and asked that State's Exhibit No. 30 be withdrawn, and if not, at least, that

---

1. At oral argument both parties agreed the jury did not see State's Exhibit No. 30 until after the second objection was made and overruled.

the FBI "rap sheet" included therein be withdrawn. It was pointed out that counsel did not have sufficient time to examine the entire file when it was first offered. The court noted it had rushed counsel at the time and allowed the objection. It was argued that the FBI report was not made by the probation officer in the ordinary course of business, was placed in the file on June 22, 1981, after the indictment had been returned and after the first setting of the trial on June 15th, and over three months after Probation Officer Lee's last contact with appellant. Appellant argued that the rap sheet containing "double and triple hearsay" was placed into the probation file in order to get it into evidence for otherwise it could not be considered as admissible evidence. Again, it was pointed out that the probation file in its entirety was full of "double, triple, quadruple hearsay," including reports to the probation officer from appellant's mother-in-law, etc.

The State countered that the objection was not timely, was not specific enough and that the FBI or NCIC record could be considered an official record and was admissible under Article 3737e, V.A.C.S. The objections and motion to withdraw the exhibit were overruled.

It is observed that the FBI "rap sheet" purports on its face to originate in Washington, D.C., and it purports to have compiled information received from unnamed sources in Houston, Brownsville and Bay City, Texas. The "rap sheet" was of one "Beltran, Noe Diaz" or "Beltran, Noe Dias," and it was not shown that the person named therein was the same person as Noe Beltran named in the indictment. See *Nichols v. State*, 504 S.W.2d 439, 441 (Tex. Cr.App.1974). No one from the Federal Bureau of Investigation testified about the compilation of the "rap sheet." Probation Officer Lee testified he made all entries into the file but he did not compile the FBI "rap sheet."

■ As exceptions to the hearsay rule Article 3731a and 3737e, V.A.C.S., in existence at the time of the instant trial, were applicable to criminal cases. *Porter v. State*, 578 S.W.2d 742, 746 (Tex.Cr.App. 1979), cert. den. 456 U.S. 965, 102 S.Ct. 2046, 72 L.Ed.2d 491 (1982). "However, in some circumstances, evidence within the ambit of a recognized exception to the hearsay rule is not admissible if it does not have the indicia of reliability sufficient to insure the integrity of the fact finding process commensurate with the constitutional rights of confrontation and cross-examination." *Porter* at p. 746 and cases there cited.

The documents and letters in *Porter* were from a federal parole officer's file pertaining to the defendant's supervision and progress while on federal parole. Determining the letters were "hearsay upon hearsay" as well as opinions, this Court wrote:

"The sources of these opinions are in most cases unnamed, and in no case are the authors or the unnamed sources shown to be competent to make the statements attributed to them. It defies reason to suggest that these letters, merely because they were collected in a file in a government office, have the indicia of reliability sufficient to insure the integrity of the fact finding process commensurate with the constitutional rights of confrontation and cross-examination." *Porter* at p. 8746. See also *McCrary v. State*, 604 S.W.2d 113 (Tex.Cr.App.1980) (involving a probation officer's report); *Coulter v. State*, 494 S.W.2d 876, 882–883 (Tex.Cr.App.1973); *Sisson v. State*, 561 S.W.2d 197 (Tex.Cr.App.1978). All of the above cases resulted in reversal.

■ Article 37.071(a), V.A.C.C.P., provides in relevant part that during the punishment phase of a capital murder trial "evidence may be presented as to any matter that the court deems relevant to sentence." It follows that the trial court at the penalty stage of a capital case has wide discretion in admitting or excluding evidence. *Smith v. State*, 683 S.W.2d 393, 405 (Tex.Cr.App.1984); *Porter v. State*, 578 S.W.2d 742, 748 (Tex.Cr.App.1979), cert. den., 456 U.S. 965, 102 S.Ct. 2046, 72 L.Ed.2d 491 (1982); *Sanne v. State*, 609 S.W.2d 762 (Tex.Cr.App.1980); *McManus v. State*, 591 S.W.2d 505 (Tex.Cr.App.1979);

*Hammett v. State*, 578 S.W.2d 699 (Tex.Cr. App.1979); *Felder v. State*, 564 S.W.2d 776 (Tex.Cr.App.1978); cert. den., 440 U.S. 950, 99 S.Ct. 1433, 59 L.Ed.2d 640 (1979); *Robinson v. State*, 548 S.W.2d 63 (Tex.Cr.App. 1977).

"However, this discretion extends only to the question of the *relevance* of the facts sought to be proved. Article 37.071(a), supra, does not alter the rules of evidence insofar as the *manner* of proof is concerned. While the facts contained in the documents in question may have been relevant to punishment, the manner in which the State sought to prove those facts denied appellant his constitutional rights of confrontation and cross-examination." *Porter*, supra, at 748; see also *Smith*, supra, at 405–06.

In the sense that unadjudicated, extraneous offenses are relevant, this Court has consistently held that such evidence is admissible at the penalty stage of a capital murder trial, and that such admission does not deprive an accused of due process and equal protection under the law. See *McCoy v. State*, 713 S.W.2d 940, 954 (Tex. Cr.App.1986); *East v. State*, 702 S.W.2d 606, 614 (Tex.Cr.App.1985); *Smith*, supra, at 406 (and cases cited therein).

Nevertheless, Article 37.071(a), supra, has never been interpreted to abolish the rules of evidence. *Rumbaugh v. State*, 589 S.W.2d 414, 416 (Tex.Cr.App.1979); *King v. State*, 657 S.W.2d 109, 111 (Tex.Cr. App.1983); *O'Bryan v. State*, 591 S.W.2d 464, 475 (Tex.Cr.App.1979); *Porter*, supra; *Cortez v. State*, 571 S.W.2d 308 (Tex.Cr. App.1978). This Court has thoroughly discussed the legislative background to Article 37.071(a), which originally included a proposed Senate amendment reading: "Any evidence that the court deems to have probative value [at the punishment phase] may be admitted, regardless of its admissibility under the exclusionary rules of evidence, but the defendant shall be accorded a fair opportunity to rebut any hearsay statements." *Rumbaugh*, supra, at 416; see also *Comment*, "House Bill 200: The Legislative Attempt to Reinstate Capital Punishment in Texas," 11 Hous.L. Rev. 410, 416–20 (1974). During the legislative process a House committee deleted from the Senate version the sentence that would have abolished the exclusionary rules of evidence in the penalty phase of a capital trial. "This can only mean that the Legislature deliberately chose not to abolish those rules. The legislative intent is clear." *Rumbaugh*, supra, at 417.

■ Furthermore, we have ruled there is no conflict between our holding that the exclusionary rules of evidence apply during the penalty phase and our previous holdings that evidence of unadjudicated, extraneous offenses is admissible at the penalty phase of a capital trial. *Rumbaugh*, supra, at 418.

■ Thus the wide discretion given to the trial court under Article 37.071(a), supra, extends only to the question of relevance of the facts sought to be proved. Article 37.071(a) does not alter the rules of evidence insofar as the manner of proof is concerned. While the facts contained in the FBI "rap sheet" and some of the documents may have been relevant to punishment, the manner in which the State sought to prove these facts denied the appellant his constitutional rights of confrontation and cross-examination.

■ The State argues that the objections were not sufficiently timely and specific. It points to the general rule that when an exhibit contains both admissible and inadmissible material the objection must specifically refer to the material deemed objectionable. See *Brown v. State*, 692 S.W.2d 497, 501 (Tex.Cr.App.1985); *Maynard v. State*, 685 S.W.2d 60, 64–65 (Tex.Cr.App. 1985); *Wintters v. State*, 616 S.W.2d 197, 202 (Tex.Cr.App.1981); *Hernandez v. State*, 599 S.W.2d 614, 617 (Tex.Cr.App. 1980) (Opinion on Motion for Rehearing). The State urges that the appellant did not comply when he made his first objection at trial and that his subsequent objections were too late. We disagree. Before the exhibit was read or delivered to the jury the appellant explained the belatedness of his objection to the FBI "rap sheet" and the court entertained his objections and

**388**

motions to withdraw the exhibit or in alternative the "rap sheet."

The trial court erred in admitting into evidence State's Exhibit No. 30 including the FBI "rap sheet." The State, however, argues that even if the admission was error, the error was not prejudicial. We pretermit any discussion at this time of such contention in view of our disposition of the case.

In point of error number five the appellant challenges the sufficiency of the evidence to sustain the jury's affirmative findings as to Special Issue No. 2, "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Article 37.071(b)(2), V.A.C.C.P.

At the penalty stage of the trial the State offered the testimony of Brownsville Police Officer Reynaldo Guillen, who testified he had known the appellant "since junior high" and that his reputation in the community for being a peaceable and law-abiding citizen was "not that good," was "bad." Former South Padre Island Police Officer Clifton Troy testified that on September 17, 1978, he stopped appellant for speeding in a motor vehicle, that appellant and the passenger, Ernesto Benavides, both had bloodshot eyes and smelled of alcohol. While attempting to handcuff Benavides at the scene, Officer Troy related that appellant stuck him in the face, and that he defended himself by kicking appellant in the stomach and using mace to subdue both men. Troy believed appellant was charged with aggravated assault on a police officer and driving while intoxicated, but he never appeared in court, and as far as he knew, "nothing ever happened ... as a result of that."

Alfonso Hernandez Lee, a Cameron County probation officer, testified that on November 24, 1980, appellant was placed on probation and that he first came into contact with appellant on December 1, 1980; that appellant reported in December and January and February, 1981, but not in March; that appellant's attitude towards probation was indifferent. Only from the probation records introduced do we learn that appellant was placed on probation by a

district court for one year for the offense of driving while intoxicated, second offense, and that his birth date was August 2, 1955. Therfore, appellant was 25 years of age at the time of the offense and 26 years of age at the time of trial. Of course, introduced into evidence was State's Exhibit No. 30 containing the FBI "rap sheet" whose admissibility was contested. The appellant offered no evidence at the guilt stage of the trial.

It is well settled that in answering the special issues under Article 37.071, V.A.C.C.P., including the issue of future dangerousness, the jury may consider all of the evidence admitted at the first or guilt stage of the bifurcated trial. *Santana v. State,* 714 S.W.2d 1, 8 (Tex.Cr.App.1986); *Fierro v. State,* 706 S.W.2d 310, 319 (Tex.Cr.App. 1986); *Garcia v. State,* 626 S.W.2d 46 (Tex. Cr.App.1981), and cases there cited. See also *Russell v. State,* 598 S.W.2d 238, 254 (Tex.Cr.App.1980); *Russell v. State,* 665 S.W.2d 771, 871 (Tex.Cr.App.1983). It has been said that the circumstances of the offense, if severe enough, may alone be sufficient to support an affirmative answer to the second special issue. *Carter v. State,* 717 S.W.2d 60 (Tex.Cr.App.1986); *Fierro v. State,* 706 S.W.2d 310, 319 (Tex. Cr.App.1986); *Bush v. State,* 697 S.W.2d 397, 399 (Tex.Cr.App.1985); *Thompson v. State,* 691 S.W.2d 627, 636 (Tex.Cr.App. 1984); *Smith v. State,* 676 S.W.2d 379, 393 (Tex.Cr.App.1983); *Roney v. State,* 632 S.W.2d 598, 601 (Tex.Cr.App.1982); *Duffy v. State,* 567 S.W.2d 197 (Tex.Cr.App.1978).

At the guilt stage of the trial the evidence shows, as earlier described, that appellant, armed with a derringer, entered a tortilla factory alone and demanded money. Appellant shot the deceased, Carmen Mendez Arechiga, as she pushed the money towards him on the counter.

In *Roney,* supra, at p. 603, this Court wrote:

"Although this was a senseless murder, that fact is true of every murder in the course of a robbery. The facts of this offense, standing alone, do not carry the marks of a 'calculated and cold-blooded crime,' such as appeared in *O'Bryan*

*v. State,* 591 S.W.2d 464, 480, where the defendant for months planned the candy poisoning of his own child to collect life insurance. To support a 'yes' answer to the second punishment issue, the evidence must show beyond a reasonable doubt that there is a probability appellant would commit criminal acts of violence that would constitute a *continuing* threat to society. To hold that the facts of *this* offense, standing alone, would support such a verdict, would mean that virtually every murder in the course of a robbery would warrant the death penalty. Such a construction would destroy the purpose of the punishment stage in capital murder cases, which is to provide a reasonable and controlled decision on whether the death penalty should be imposed, and to guard against its capricious and arbitrary imposition. *Jurek v. State,* 522 S.W.2d 934 [Tex.Cr.App.1975]; *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 [1976]."

At the penalty stage of the trial the State proved that appellant was on probation for felony driving while intoxicated at the time of the alleged offense, that there had been an assault upon a police officer, though apparently no trial resulted, and through one officer, that appellant's reputation for being a peaceable and law-abiding citizen was bad. In addition the State was permitted to introduce State's Exhibit No. 30, the probation file, including the FBI "rap sheet," although this was improperly admitted. This "rap sheet" reflected ten arrests for a Noe Beltran, a Noe Diaz Beltran and a Noe Dias Beltran. Two of the arrests resulted in convictions, one for driving while intoxicated and one for "drunk." The other arrests, not reflecting convictions, were for driving while intoxicated, "drunk in auto," possession of marihuana, aggravated assault on peace officer and three burglaries. Other than the assault upon the officer, there was no showing of any other act of violence connected with said offenses. The probation file (independent of the rap sheet) shows that appellant, 25–years-old at the time, had not had a conviction or juvenile adjudication for the last five years and there was no psychiatric testimony offered.

 In connection with the consideration of State's Exhibit No. 30, this Court has held that in determining the sufficiency of the evidence, the reviewing court must consider all the evidence, whether properly or improperly admitted. *Chambers v. State,* 711 S.W.2d 240, 247 (Tex.Cr.App. 1986) (On State's Motion for Rehearing); *Gardner v. State,* 699 S.W.2d 831, 835 (Tex.Cr.App.1985) (On Appellant's Motion for Rehearing); *Bain v. State,* 677 S.W.2d 51, 52, n. 1 (Tex.Cr.App.1984); *Porier v. State,* 662 S.W.2d 602, 606 (Tex.Cr.App. 1984); see also *Garza v. State,* 678 S.W.2d 183, 193 (Tex.App.—San Antonio 1984, PDR granted); *Troncosa v. State,* 670 S.W.2d 671, 679 (Tex.App.—San Antonio 1984, no writ). This rule applies because the admission of illegal evidence is trial error and therefore the proper remedy is to reverse the conviction and remand the cause for a new trial. *Adams v. State,* 639 S.W.2d 942, 943 (Tex.Cr.App.1982); *Gregg v. State,* 667 S.W.2d 125, 130 (Tex.Cr.App. 1984); *Schmidt v. State,* 659 S.W.2d 420, 422 (Tex.Cr.App.1983); *Collins v. State,* 602 S.W.2d 537, 539 (Tex.Cr.App.1980).

In the instant case appellant claims that even with State's Exhibit No. 30 including the "rap sheet" the evidence as a whole is insufficient to support an affirmative finding to the issue of future dangerousness, Special Issue No. 2. See *Porier v. State,* 662 S.W.2d 602, 606 (Tex.Cr.App.1984). Cf. *Collins v. State,* 602 S.W.2d 537 (Tex.Cr. App.1980); *Roeder v. State,* 688 S.W.2d 856, 859 (Tex.Cr.App.1985). In view of appellant's contention, we are free to review both the properly and improperly admitted evidence.

 When deciding whether there was sufficient evidence to support a jury's finding that there is a probability the defendant will commit criminal acts of violence that will constitute a continuing threat of violence to society, this Court must view the evidence in the light most favorable to the verdict to determine whether a rational trier of fact could have found the elements of Article 37.071(b)(2),

V.A.C.C.P., beyond a reasonable doubt. See *Santana v. State*, 714 S.W.2d 1 (Tex. Cr.App.1986), and ·*Fierro v. State*, 706 S.W.2d 310, 313 (Tex.Cr.App.1986). "Prior criminal conduct, the age of the defendant and psychiatric evidence are among the various other factors relevant in deciding the record punishment issue." *Roney*, supra at 601. Other factors have been discussed in *Brasfield v. State*, 600 S.W.2d 288 (Tex.Cr.App.1980); *Milton v. State*, 599 S.W.2d 824 (Tex.Cr.App.1980); *Hovila v. State*, 562 S.W.2d 243 (Tex.Cr.App.1978). Psychiatric testimony, however, is not essential to support an affirmative answer to the question of future dangerousness. *Carter v. State*, 717 S.W.2d 60 (Tex.Cr. App.1986); *Williams v. State*, 668 S.W.2d 692 (Tex.Cr.App.1983); *Mitchell v. State*, 650 S.W.2d 801 (Tex.Cr.App.1983).

In order to determine whether the facts present in the instant case were sufficient, we may look to other cases where the State failed to present sufficient evidence. We have, inter alia, examined the cases of *Roney v. State*, 632 S.W.2d 598 (Tex.Cr. App.1982); *Garcia v. State*, 626 S.W.2d 46 (Tex.Cr.App.1982); *Wallace v. State*, 618 S.W.2d 67 (Tex.Cr.App.1981); *Brasfield v. State*, supra; *Warren v. State*, 562 S.W.2d 474 (Tex.Cr.App.1978). No two cases are, of course, exactly alike.

According to the State's evidence, the instant murder case was clearly senseless and unnecessary as most murders committed in the course of a robbery are. There was no showing that the robbery was long in planning or that murder or violence was intended although the appellant was armed when he entered the store. Given the facts of the offense itself, we cannot say they were inherently sufficient to support the affirmative finding in question. There was no psychiatric evidence at the penalty stage of the trial although the same was not essential. One witness did testify appellant's reputation was "bad," and appellant did have a prior criminal record as previously detailed. There were only two, possibly three, convictions for driving while intoxicated and "drunk." These were all alcohol related and were not shown to be criminal acts of violence. The unadjudicated offenses were not shown to involve criminal acts of violence or assaultive offenses except the assault upon Officer Troy, who testified there had been no trial and "nothing had ever happened." In order to support a "Yes" answer to the issue of future dangerousness the evidence must show beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a *continuing* threat to society. Article 37.071(b)(2), supra; *Roney*, at 603.

We find that in viewing the evidence as a whole and in the light most favorable to the jury's verdict and under the test described above, see *Santana*, supra, and *Fierro*, supra, there is insufficient evidence to support the affirmative finding to the second special issue under Article 37.-071(b)(2), supra.

This holding affects only the death penalty assessed and any other points of error relative to the jury's findings on the issue of punishment. As such, appellant's other points of error concerning errors at the penalty stage of the trial are moot. *Sanne v. State*, 609 S.W.2d 762 (Tex.Cr.App.1980).

Nevertheless, a brief discussion of several of these points of error are important as a background to our holding. Appellant advances five points of error concerning the trial court's refusal to accept as the jury's verdict which left Special Issue No. 2 unanswered.[2]

---

2. Appellant's points of error on this issue read:
"(6) THE COURT ERRED IN DENYING APPELLANT'S MOTION TO RECEIVE THE JURY'S VERDICT ON PUNISHMENT WHICH LEFT SPECIAL ISSUE NO. 2 UNANSWERED.
"(7) THE COURT ERRED IN DENYING APPELLANT'S MOTION FOR NEW TRIAL BASED ON THE COURT'S FAILURE TO RECEIVE THE JURY'S VERDICT ON PUNISH-MENT WHICH LEFT SPECIAL ISSUE NO. 2 UNANSWERED.
"(8) THE COURT ERRED IN DENYING APPELLANT'S MOTION REQUESTING THAT THE JURY'S VERDICT ON PUNISHMENT ANSWERING BOTH SPECIAL ISSUES IN THE AFFIRMATIVE NOT BE RECEIVED.
"(9) THE COURT ERRED IN OVERRULING APPELLANT'S MOTION FOR NEW TRIAL BASED ON THE COURT'S REFUSAL TO AC-

The court's charge at the penalty stage included the following paragraph:

"If there is any Special Issue on which the vote of the jurors is not unanimously 'Yes' or not at least ten (10) in favor of an answer of 'No,' then there shall be no answer for that Special Issue and the Foreman should not sign his name to any answer for that Special Issue." See Article 37.071(e), V.A.C.C.P.

The record reflects that the jury retired to deliberate at the penalty stage of the trial at 3:04 p.m. on August 20, 1981. At 5:09 p.m. the jury sent a note to the court, which read:

"May we leave one question blank if we cannot vote unanimously 'yes' or 'no' by 10 or more votes? This is referring to Special Issue question number 2."

Upon receipt of the note, the defense counsel stated it was his opinion that the charge "covers this note specifically" and urged the court to refer the jury specifically to the proper paragraph in the charge [quoted above]. The court declined the suggestion stating the jury should be referred to the charge "period," not to a specific paragraph. The court prepared an answer reading:

"You should continue your deliberations and be guided by the instructions in the charge."

The appellant's counsel objected to the answer[3] which was overruled. At 5:25 p.m. the court's answer was sent to the jury. At 5:44 p.m. the jury reported

through the bailiff that a verdict had been reached. When the judge examined the verdict in open court the following took place:

"THE COURT: Okay. Mr. Reyes [the foreman], the jury answered 1 yes and did not answer number 2.

"THE FOREMAN: Yes, sir. That is right.

"THE COURT: Is there any chance that if you continued deliberations you might be able to answer Question Number 2?

"THE FOREMAN: Your Honor, I believe that we went by the paper there.

"I think maybe we could have misunderstood on the last question we sent to you whether we were supposed to come to an answer on both questions.

"THE COURT: Yes. Give me the note.

"THE FOREMAN: You put it on the bench.

"THE COURT: Yes, well, the answer was that you should continue your deliberations and be guided by the instructions.

*"The purpose of my telling you that was to see if you could reach a verdict in this matter.*

"MR. McNAMARA: Your Honor, I must object and request that the jury's verdict be received.

"The instructions of the court have been followed.

CEPT THE JURY'S VERDICT RENDERED LEAVING SPECIAL ISSUE NO. 2 UNANSWERED WITH SUCH VERDICT WAS RENDERED IN COMPLIANCE WITH THE CHARGE AS GIVEN BY THE COURT AND WITH THE COURT'S REPLY TO THE JURY'S REQUEST FOR GUIDANCE AS TO HOW TO ANSWER SPECIAL ISSUE NO. 2.

"(10) THE COURT ERRED IN OVERRULING APPELLANT'S MOTION FOR NEW TRIAL BASED ON THE COURT'S INSTRUCTION TO THE JURY TO DELIBERATE FURTHER EVEN THOUGH THEY HAD SUBMITTED A VERDICT TO THE COURT PURSUANT TO THE COURT'S CHARGE AND THE COURT'S RESPONSE TO THE JURY'S REQUEST FOR GUIDANCE AS TO HOW TO ANSWER SPECIAL ISSUE NO. 2."

3. "MR. McNAMARA: Defendant objects to the court's response to the note, as the court's

response to the the note suggests that the jury has to reach a verdict, which they do not.

"It is contrary to the instructions of the court which state that they shall not answer the issues in the affirmative unless 12 jurors agree, or answer in the negative unless ten jurors agree, and urge that the suggestion of defendant that that portion of the charge previously read into the record be pointed out to the jury, or in the alternative that the court answer the jury's note, 'Yes, you may leave one question blank.'

"I believe I already mentioned that the portion of the charge I'm referring to is contained in Item 2, Paragraph 1, 2, 3—Paragraph 3 of Item 2 in the charge.

"THE COURT: Okay. The objection will be overruled."

"THE COURT: The objection will be overruled.

"My question to you is that if you continued to deliberate for a while longer that you might be able to reach a verdict, *be able to answer the questions.*

"THE FOREMAN: Yes, sir.

"THE COURT: You think you can?

"THE FOREMAN: I believe we can.

"THE COURT: Okay. I'll ask you to return to the jury room and resume your deliberations.

"While you are here, I'll ask you to deliberate to about 6:30, and if you can't reach a verdict at that time, if you will please let me know, I'll send off for some food for you and then see if you can continue to deliberate, *to see if you can reach some kind of answer to Question Number 2.* Okay? *At least try.*" (Emphasis supplied.)

At 5:47 p.m. the jury retired to deliberate further, at which time defense counsel again specifically objected to the trial court's instructions:

"MR. McNAMARA: Your Honor, at this time I strongly object to the instructions that were given to the jury because they can have no effect but to confuse them on the charge.

"The charge clearly states that 'If there is any Special Issue on which the vote of the jurors is not unanimously 'Yes' or not at least ten (10) in favor of an answer of 'No,' then there shall be no answer for that Special Issue and the foreman should not sign his name to any answer form for that Special Issue.

"This was the verdict that was returned to the court, this was the verdict that should have been received, and at this time the defendant moves for a mistrial.

"THE COURT: Okay. The motion for mistrial will be overruled at this time.

"MR. McNAMARA: Your Honor, the record does reflect that Special Issue Number 2 was unanswered, is that correct?

"THE COURT: That is correct. Only Special Issue Number 1 was answered."

At 6:15 p.m. the jury again announced that a verdict had been reached. This time special issue number two was answered affirmatively. At the request of the appellant a jury poll only as to the second special issue indicated that this was the "verdict" reached by all members of the jury.

The appellant contends the court erred in not accepting the jury's verdict with Special Issue No. 2 unanswered. It is observed that the above events occurred on August 20, 1981, a few days before the 1981 amendment to Article 37.071 (Acts 1981, 67th Leg., p. 2673, ch. 725, § 1, eff. August 31, 1981). The 1981 amendment requires the trial court to sentence a defendant to life imprisonment if the jury is unable to answer any special issue submitted. Thus "a jury's inability to answer a punishment question in a capital murder case has the same sentencing effect as a negative answer." *Padgett v. State,* 717 S.W.2d 55, 58 (Tex.Cr.App.1986). The amendment was not in effect, however, at the time of appellant's trial.

In *Eads v. State,* 598 S.W.2d 304 (Tex.Cr. App.1980), decided prior to the 1981 amendment, the jury returned a "verdict" which omitted answers to special issues numbers one and two and answered only special issue number three. The trial court accepted the "verdict" and assessed life imprisonment. This Court found the "verdict" was incomplete and the trial court erred in accepting the same as a verdict and reversed the conviction. In *Muniz v. State,* 573 S.W.2d 792 (Tex.Cr.App.1978), also decided before the 1981 amendment, the judgment of conviction was affirmed. In *Muniz* the jury left the second special issue unanswered and the judge retired the jury for future deliberations upon said issue. There was no abuse of discretion in such action, and the verdict answering the second special issue was upheld. In *DeLuna v. State,* 711 S.W.2d 44, 47 (Tex.Cr.App. 1986), decided after the 1981 and 1985 amendments [4] to Article 37.071, supra,

4. (Acts 1985, 69th Leg., ch. 291, § 1, eff. Sept. 1, 1985; Acts 1985, 69th Leg., ch. 685, § 8(b); Acts

1985, 69th Leg., ch. 576, § 1, eff. Sept. 1, 1985.)

there was no abuse of discretion under the circumstances there described, and where the jury had answered the first special issue but not the second, and the court retired the jury for future deliberations and a completed verdict was later accepted.

In the instant case the trial judge did not abuse his discretion in retiring the jury for future deliberations given the circumstances and law in effect at the time. The events do indicate, however, the jury's difficulties in arriving at an answer to the issue of future dangerousness.

Without the necessity of deciding, we observe that appellant also contends there was jury misconduct at the penalty stage of the trial in that the jury received other evidence and did not receive a fair and impartial trial. See Article 40.03(7) and (8), V.A.C.C.P. At the hearing on the motion for new trial the appellant introduced affidavits from three jurors. Sister Theresa Streif, a Catholic nun, swore that she mentioned during deliberations that the verdict was merely advisory and the judge could sentence the defendant as he saw fit either accepting or rejecting the verdict. Juror Mabel Hanks swore there was not enough evidence to convince her that there was a probability of future dangerousness. She recited the notes to the judge, and his answers, and stated she finally voted "Yes" because she believed Sister Theresa Streif's statement, and that appellant would get a new trial or the judge would give him life imprisonment regardless of the verdict. Juror Mary Gaytan swore she did not believe the evidence sufficient to affirmatively answer the special issue as to future dangerousness, but felt after the judge's instructions the issue had to be answered and she did, believing the appellant would automatically get a new trial. Since we do not decide the issue of jury misconduct, no further comment need here be made.

■ Since the evidence was insufficient to support the affirmative answer to the issue of future dangerousness and there were no allegations of error committed during the guilt stage of the capital murder trial, we will reform the trial court's judgment to life imprisonment. See *Roney*, supra, and *Wallace*, supra.

The judgment, as reformed, is affirmed.

W.C. DAVIS and WHITE, JJ., concur.

CLINTON, J., concurs, would add with respect points one and two, that data in NCIC reports are so notoriously flawed, *Gassett v. State*, 532 S.W.2d 328, 330–331 (Tex.Cr.App.1976), that even the F.B.I. will not vouch for their accuracy.

MILLER and CAMPBELL, JJ., dissent to disposition of point of error number five (sufficiency question).