**Michael Wayne NORRIS, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 69,856.

Court of Criminal Appeals of Texas,
En Banc.

March 1, 1995.

Rehearing Denied May 17, 1995.

Randy Schaffer, Wendell A. Odom, Jr., Cynthia Henley, on appeal only, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty., & Timothy G. Taft, Ira Jones & Debbie Mantooth, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

*OPINION*

McCORMICK, Presiding Judge.

A jury convicted appellant of capital murder under V.T.C.A., Penal Code, Section 19.03(a)(6)(A).[1] The trial court sentenced him to death after the jury affirmatively answered the special issues. Appellant presents nineteen points of error. We affirm.

■ Appellant challenges the sufficiency of the evidence to support his conviction; therefore, we set out the relevant evidence from the guilt-innocence stage. The evidence shows Georgia Rollins and appellant were romantically involved. Appellant sometimes babysat Georgia's two-year old son (the baby). On the evening of the offense, Georgia would not allow appellant to babysit the baby while Georgia attended church, as they previously had agreed. Georgia took the baby to church with her. Appellant appeared at the church during the services to get the baby, and had some type of confrontation with Georgia during which a security guard had to intervene. Appellant became angry, went home without the baby, and took a nap. Appellant lived a short distance from the mother's apartment.

Appellant claimed he attempted to contact Georgia by telephone later that night but she would hang up the phone each time he called. Appellant took a high-powered deer rifle to Georgia's apartment, which she shared with other members of her family who were home at the time, and shot the baby and Georgia (the mother) at close range inside the mother's bedroom. The baby was killed instantly, and the mother died later that night at a local hospital.

The mother's family members, none of whom were in a position to see the entirety of the events occurring inside the mother's

---

1. In 1993, this subsection was renumbered to V.T.C.A., Penal Code, Section 19.03(a)(7)(A). The two provisions are identical; we refer to Section 19.03(a)(6)(A) in this opinion since that *is* the applicable provision. Section 19.03(a)(6)(A) states:

"A person commits an offense if he commits murder as defined under Section 19.02(a)(1) of this code and the person murders more than one person during the same criminal transaction."

bedroom, provided testimony that appellant appeared outside the mother's bedroom window, broke the glass and fired a shot into her bedroom. The mother was talking to someone on the telephone when appellant broke the glass in her bedroom window. Appellant climbed into the bedroom and said to the mother, "I hate to do this Georgia, but I told you. I told you you couldn't mess me over. I told you you couldn't leave me." He then fired several shots in the mother's direction. He left the room, turned the doorknob on another bedroom door in the apartment, and returned to the mother's bedroom. He then told the mother he hated to see her suffer and fired a couple of more shots in her direction. The mother's family members testified they heard about five shots but they could not be sure. The mother's sons saw appellant leave the mother's bedroom with the rifle. Appellant said to them, "Y'all get out of my way. Let me go out. I done come and do what I come to do. Just let me go out."

Appellant returned home, where he lived with his mother, told her he had killed the mother and the baby, and he was sorry. Appellant's mother testified appellant was sobbing. Appellant also called his pastor and the police to turn himself in. The police arrested appellant shortly thereafter at his home without incident and seized the rifle. Later that night, appellant confessed to the police he had killed the mother and the baby, and he was sorry.

The police quickly arrived at the mother's apartment and secured the scene. Officer Gafford testified he found three spent rifle casings inside the mother's bedroom and one outside her bedroom window. Another spent casing was found in appellant's rifle. Gafford testified he observed five total wounds on the baby. Several crime-scene photographs, showing multiple wounds on the baby, were admitted into evidence.[2]

The State presented other evidence showing the baby suffered four initial entry wounds: two to the head, one to the chest, and one to the right leg or thigh, which was nonfatal. The gunshot wounds to the head and chest were fatal. The mother suffered three "irregular gunshot wounds" to the head and chest and fragment wounds to her face, neck, chest, and left arm going into the chest. The gunshot wound to the chest and the gunshot wound to the left arm going into the chest were fatal. Most of the wounds the mother suffered were from fragments of bullets that first hit the baby.[3]

The State's evidence also showed that when appellant fired the first shot from outside the mother's bedroom the mother was sitting or kneeling on the floor next to her bed, and the child was lying on the bed. The first shot hit the baby in the right leg or thigh, and the mother picked up the nonmortally wounded baby and held him to her breast crying, "my baby, my baby." Appellant climbed into the mother's bedroom and fired another shot. This shot entered the baby's forehead and fragmented; the fragments came out of the back of the baby's head in three places and hit the mother in

---

2 "Q. Now other than the head injuries, did you see any more indications of bullet injury or blood splatter to the body that would indicate a bullet injury other than the rather massive ones to the head?
"A. Yes, sir. There were four others.
"Q. Where were they?
"A. There would be one to the leg. I believe it was approximately four inches—extended approximately four inches above the knee, in which the flesh was torn away from the leg; one under the armpit. And I say 'under the armpit'; I'm not exactly certain, just by recollection, which arm it was, but under the armpit there was a very large wound and then one have (sic) large wound to the center chest. "Those are the ones that I recall at this moment. I know that—I know there were five wounds, total."

3. The medical examiner testified an "irregular gunshot wound" means the bullet probably hit something else before hitting the mother.

"A. The word I used in here describing: 'irregular gunshot wound.' Now, when I say 'irregular gunshot wound,' it means that the missile was not one that has not been touched. This wound I called 'irregular.' It can be a foreign bullet or the fragment of the bullet. I can't say if it's a whole bullet or part of the bullet, because—I can't say. But I know the bullet that hit this area is not in perfect shape. It could be—hit something else first and then hit that area. That's why I call it 'irregular gunshot wound.' "

the face and neck, fracturing her jaw and exiting through her tongue. The medical examiner testified the mother's wounds from this shot were nonfatal.[4] Thereafter, appellant shot the baby and the mother several more times.

"Q. Doctor, I want to pose a hypothetical to you. Just assume certain facts; and then I will ask you to render a medical opinion, just assuming these facts; all right?

"I'm going to show you what's been marked as State's Exhibit 2; all right? Assume, if you will, that this diagram, State's Exhibit 2, is an apartment floor-plan—okay—and that you have a chair, a bathroom, a closet, a television, a bed, a dresser, and a rug upon the floor here. These will be pillows. And this rectangular object will be a bed; okay? Assume, also, if you will, that a woman with the same size and shape body figure as [the mother] were (sic) sitting on the floor about right here, in State's Exhibit 2, on her knees, talking on the phone, possibly leaning on the bed; okay?

"Assume, also, a child about the size of [the baby], approximately twenty-nine pounds, is lying on the bed, within a foot or two of this woman, with its head facing toward the pillows.

"Assume, also, that some person sticks a 30–30–caliber rifle through this window and fires one shot, which goes and clips the right leg of the child and then fragments and strikes [the mother] who is leaning forward, talking on the phone, facing the bed in the left side.

"Would the wound to the [child's] right leg and the wound to the left chest [of the mother]—the fragmented area that you've described—be consistent with such a wound?

"A. Yes, sir, because the—it is consistent with the missile hitting the thigh and hitting something else upward.

"Q. Assume, further, that after that happened, the [mother] picks up the baby and holds it to her chest and that a person comes and stands at the foot of the bed and fires shots at her, while she is holding the baby in front of her or to the side of her.

"Are the wounds upon the [baby's] body consistent with that?

"A. Yes, sir, especially the one on the head with the three exits and then those—some laceration on this part (indicating). As I said earlier, there was some laceration, as I see, over here. Those could be done by fragment of bone—flying fragment of missile. An intact missile would not produce those small lacerations. It's like something shattered and hit the person. That's why I formed my opinion that on the mother—my opinion that something hit first before it hit and made this form of injury on this part of the mother.

"Q. From the angle of the bullets that struck [the baby] and the angle of the bullets and the fragments which struck [the mother], would they be consistent with a person standing about right here, firing at a downward angle?

"A. It could be consistent with many directions, provided you align the—

"Q. But assume that [the mother]—let's say it's not [the mother] but a woman of her size and shape—is possibly wounded while holding the child to her.

"Are the wounds to the front of the child's head, fragmenting out the back, and to [the mother's] chest and face consistent with a downward shot of a person standing here, firing downward at her while she is holding the child?

"A. It could be.

---

4. The medical examiner testified:
"A. The missile perforated the subtissue and jaw of the left side of the face, the maxilla, the tongue, the mandible; exited on the right side of the jaw at a point one inch to right of midline and eight inches below the top of the head. If that were coordinate, that's where it exited.

"Q. Were you able to determine the tract of that missile.
"A. Yes, sir. Where it entered, where it exited, the direction of the missile is from left to right, downward towards the front. This particular gunshot wound did not kill the [mother] because it does not involve any vital structure."

"Q. Is it consistent with it?

"A. If it's lined up in that direction, yes, sir.

"Q. Assume, also, that the person here fires two shots and he goes out this door and does something for a few minutes and comes back and then fires two more shots.

"Are your findings consistent with a woman—who still holding the child—possibly now lying against the bed or on the floor?

"A. Yes, sir, provided the alignment of the wound is in the line—you see, the direction of the missile—we call it opposite where the gun coming from."

Appellant testified at the guilt-innocence stage that he did not intend to use the rifle when he went to the mother's apartment, and that he took the rifle with him for protection from the mother's sons in case there was any trouble. He testified he wanted to talk to the mother about why she was treating him badly, but she refused to answer the door.[5] Appellant testified he was emotionally distraught because the mother embarrassed him at the church, hung up the phone when appellant tried to call her and refused to talk to him when he came to her apartment. Appellant also testified he was depressed because of the problems in their relationship.

Appellant testified he intended to kill only the mother when he shot the baby. Appellant also testified that when he fired the first shot from outside the mother's bedroom window the mother was kneeling by the side of the bed holding the baby against her left breast.[6] He said he aimed away from the baby, and fired in the direction of the moth-

er's right breast but the shot went through the baby's head, and also hit the mother in the face or the neck.

"Q. So that first shot would have hit the baby in—what?—the right side of the head?

"A. Right side of the head and come out the front and blow the back open.

"Q. Blow the back of the baby's head off.

"A. Open, not off. Open.

"Q. And [the mother] is hit also; isn't that correct?

"A. Right. I think I probably hit her in the face or the neck when it went through [the baby].

"Q. Face or neck?

"A. Face or neck or somewhere like that."

According to appellant, this was when the mother began crying, "my baby, my baby." [7]

"Q. Tell the jury whether or not [the mother] moved the baby before the bullet struck, if you know."

"A. To be honest with you, it happened so quick, I can't tell how she moved; but some kind of way, the first shot went through the baby's head and hit her, too, because after the first shot, the [mother's sons] ran out of the room.

"Q. What did you do next? Tell the jury what you did next.

"A. I stepped into the bedroom and walked up and looked at them.

"Q. How did the baby appear to you?

"A. He was in real bad shape. The bullet had went in and, you know, blowed the side of his head open.

---

5. One of the mother's sons and her daughter-in-law testified they did not realize anything was wrong until they heard glass breaking in the mother's bedroom.

6. The State claimed the baby was lying on the bed when appellant fired the first shot from outside the mother's bedroom window.

7. The State had presented evidence that at this time the mother was probably incapable of saying anything because this shot fractured her jaw and went through her tongue. See, *supra*. And, the prosecutor argued this evidence to the jury:
 "The [appellant] says one hit [the mother] in the face. Remember that? I asked him specif-

ically. I stood right there and said, 'Well, where did the bullet go?' 'First we got the baby in the head. Then we got her in the face or the neck,' if you'll check back in the testimony. If that's true, how is she going to say, 'Oh, my baby; oh, my baby?' when both jaws are shattered by the blast of a high-powered rifle. It even went through the tongue. Nobody is going to clearly hear you say, 'Oh, my baby; oh, my baby.' You can't do it because your mouth is mangled. The [appellant] says that one bullet was fired to hit that baby. Well, the doctor said it ain't so. Here they are; we have pictures of it."

"Q. How did you feel when you saw that you had hit the baby that you had been taking care of?

"A. I didn't feel real bad (sic).

"Q. What did you do next?

"A. She was moaning, saying, 'My baby, my baby,' you know, and crying."

Appellant testified he then climbed into the mother's bedroom and shot her two or three times. Appellant claimed he shot the baby only once.

"Q. So how many times did you shoot [the mother] and the baby?

"A. I shot—the baby got shot one time. The first shot went through his head and hit [the mother]."

He testified someone, possibly the police, shot the dead baby several more times to make it look like appellant intentionally killed the baby.

"Q. It's cruel and unusual punishment; so you just decided to start blasting away a woman with her baby?

"A. The baby was killed instantly. The baby was already dead. I didn't attempt to move it at all. I just stood there and shooting two or three more times. And by me having another shot, all of this is coming to her left side. And that's how her arm—they say her arm was shot or something. That's probably how it was shot. From there—all them other shots they claim was in the baby—I don't know how they get in there. But when they left I only saw that one wound to the head from that first shot, if it did that. How all these other holes get on him I don't know.

\* \* \* \* \* \*

"Q. Isn't it amazing how two bullets get right into that baby's body, without anybody trying to—

"A. Amazing. I can't figure it out. That's why I wanted to take the stand and tell my part. And it be up to the jury to believe what they want to believe.

\* \* \* \* \* \*

"Q. Let's take a look at State's Exhibit 36. Here's [the baby's] right leg, shot from behind; blew his leg right open. How do you suppose that happened?

"A. Can't figure it out, because I never was behind him like that. I was always to, like I say, the side, behind the—behind; so how this stuff—I don't know. If somebody tampered with the baby after it was already dead to make things look like I definitely intended to do it, then it's a possibility. It could have happened. I'm sure the State of Texas is going to try all they can to try to get me the death penalty. However you going to do it, you'll do it. I don't know how you going to rig that up.

"Q. Did the police shoot the baby after it was dead? Is that what you're saying?

"A. Something like that. I don't know how it was done like that.

\* \* \* \* \* \*

"Q. Your view is all this happened just with one bullet?

"A. My view is one bullet did that damage to its head. And after I looked at him, wasn't nothing wrong with—with his chest or his legs, as far as a I saw. I myself—I'm the one that was there. After I left—all this other damage happened to him—I don't know how it happened. But like I say, I'm sure y'all are going to do everything you can. It's a final Judgment Day after this 2in (sic) is the end of the world. I believe in The Resurrection."

The State cross-examined appellant on the two prior statements he made to his mother and to the police just after the killings in which he admitted killing the mother and baby, but never claimed he accidentally killed the baby. Appellant testified he told the police he accidentally killed the baby but they did not put that in his confession. The prosecutor noted the police put other mitigating matters in appellant's statement such as his being sorry for the killings. Appellant also testified he previously pulled a pistol on the mother and threatened to kill her and himself if she ever left him.

Based on the forensic and other evidence in the record, including appellant's testimony, the prosecutor made the following argument to the jury at the guilt-innocence stage:

"... I submit to you what really happened is that [appellant] fired that bullet and he probably clipped that [baby's] leg. That's when she put the baby to her chest, saying, 'Oh, my baby.' And he took this gun and he came in there and he stood at the foot of that bed. How far is that? Six feet? Eight feet? Whatever it is. And he looked and aimed down that rifle and he shot. And I submit to you that probably the first one is the one that blew [the baby's] head off, because, holding the baby to the chest, what's the mother going to do? She's down there. She's giving it this (indicating), saying, 'Oh, my baby.' The baby's little head is going to be toward him. She's not going to look at him head on. She's going to look at him like this. The bullet went right through the little head. That's when [the mother] got the chest splatter. He cocked the gun again. He fired another shot. I submit to you that's the one that probably hit [the mother], going down into the chest. Then he goes out into the hall and tries a door. I asked him, 'You were looking for Ramona; weren't you? You don't like Ramona; do you?' [8] He couldn't get in. And then he came back and cocked this gun again and fired again. Conceivably, that's the one that came (sic) the left side of the baby's head, because these particular wounds are downward angles. Mamma is on her knees, down from him. He's standing up, shooting downward, probably with this many shots. It's natural to assume she's losing her grasp on her child. That's when he got the baby in the chest. And he said it. It's in the record. There was a gap between them. I tell you why the gap: because the bullet wound is to her. She's bleeding internally from the wound. The bullet fragment hit her lungs, hit her liver. She's bleeding internally. She's losing her grip. That's how, if you're firing, you can get a downward shot through that baby in the chest. The last shot, I submit to you, went to her face, and she fell forward on the bed.

"It's a reasonable deduction from the doctor's testimony.

"A hull was found in the gun, which was recovered. If [appellant] did not intend to kill that baby—if there was no intent, why is it his mind is consumed, from his testimony and his statement, with 'I'm going to get that baby; I'm going to get that baby; she's going to bring it to me; I'm going to go to the church and get the baby; I want the baby now?' He's fascinated with that baby. And what does he really want with the baby? He wants to control the mother. If you can keep that baby prisoner and control it and have your hands on it, mamma has got to do what you're saying. That's what was really in [appellant's] mind from the beginning to the end. It's a control objective: I got you. I got your baby and when you jack me around and you embarrass me, I'm going to crush your baby.

"I submit to you from the evidence, from [appellant's] hatred, what you know about him, he was aiming at that baby because how in the world do you get two bullet hulls in a little skull that big unless you stand this close and you aim down that rifle? Why two in the head? Why one in the chest. Why does only mother suffer fragments? She's a much bigger target, as you can see here. Certainly, I'm not being offensive when I say that. Her head is a lot bigger than [the baby's]. Why isn't he aiming at her head? This is a rifle. Look down that long barrel, down the side. You can hit anything you want, and he was just a few feet away. Think about common sense.

"... Apply the test of common sense and reason. He meant to kill that baby. It's the worst, most foul, hurtful thing he could do to [the mother]: hurt her baby. 'You won't let me have it; you won't let me control it; I'll crush it; and I'll kill you; get you in the face. I told you I'd shoot you in the head with this gun, and I'm going to get you.' Horrible. Intent.

8. There was some evidence that Ramona, who was the mother's daughter-in-law, may have been in this room, and that Ramona disapproved of appellant's involvement with the mother, which appellant knew.

"Well, you've seen it all; I'm not going to bore you with it.

"Probably the best evidence of his intent to kill are pictures of this baby and the wounds upon it and the doctor's testimony. Even in death the baby does give testimony. Perhaps this is a type of resurrection (indicating).[9] Intent. Intent. Intent. Intent."

The jury was instructed that appellant could be convicted of capital murder if it found appellant intentionally caused the death of the baby by shooting him with a firearm and intentionally caused the death of the mother by shooting her with a firearm, and the deaths of both occurred during the same criminal transaction. The jury also was instructed, pursuant to V.T.C.A., Penal Code, Section 6.04(b)(2), that it could find appellant guilty of capital murder if it found appellant intentionally caused the death of the mother by shooting her with a firearm and during the same criminal transaction either intentionally caused the death of the baby by shooting him with a firearm, *or intended to cause the death of the mother by shooting her with a firearm, and caused the death of the baby by shooting him with a firearm and the only difference between what actually occurred and what he desired, contemplated, or risked is that a different person or property was injured.*

In his first point of error, appellant claims the evidence is insufficient to prove he specifically intended to cause the death of the baby. And, in his second point of error, he argues the transferred intent doctrine, contained in Section 6.04(b)(2), does not apply to a capital murder prosecution under Section 19.03(a)(6)(A), and, without an application of Section 6.04(b)(2), the evidence is insufficient to support his conviction.[10] The State argues the evidence, when viewed in the light most favorable to the verdict, is sufficient to prove appellant specifically intended to kill the baby.

We agree. The evidence shows appellant inflicted the fatal wounds to the baby from a short distance with a high powered rifle that had to be recocked and reaimed between each shot. The baby was in full view of appellant, and appellant admitted seeing him. Four of the five shots appellant fired initially struck the baby, and most of the mother's wounds were caused by fragments of bullets that first hit the baby. We agree with the following statements in the State's brief:

"A rational jury certainly could have concluded, from the conduct of appellant in shooting a high-powered hunting rifle at the baby (whom he admitted he saw) and [the mother] with every wound to the baby being an initial penetration and only some of the wounds to [the mother] being possible initial penetration wounds, from the admissions of the appellant that he shot both victims and from the only mention of lack of intent to shoot the baby being brought up for the first time at trial in a most incredible manner, that the appellant intentionally caused the death of [the baby]."

Under the applicable standard of review, we hold the jury rationally could have concluded beyond a reasonable doubt that appellant specifically intended to kill the baby. See *Griffin v. State,* 614 S.W.2d 155, 159 (Tex.Cr. App.1981).

■ However, this does not end the inquiry since appellant claims he could have been convicted under an impermissible legal theory—the application of Section 6.04(b)(2). See *Ex parte Drinkert,* 821 S.W.2d 953, 955 (Tex. Cr.App.1991) (plurality op.)[11] The State ar-

---

**9.** Appellant had testified on cross-examination he believed the baby would be resurrected from the dead someday.

**10.** Appellant also argues it was error to submit a transferred intent theory in the jury charge because that theory was not alleged in the indictment. However, this Court has held the transferred intent theory need not be alleged in the indictment for it to have later application in the case. *Dowden v. State,* 758 S.W.2d 264, 274 (Tex.Cr.App.1988).

**11.** Since the evidence is sufficient to support a finding that appellant specifically intended to kill the baby, appellant would only be entitled to the remedy of a new trial were we to decide the jury was erroneously instructed on the application of Section 6.04(b)(2), and that appellant suffered some harm. See *Ex parte Drinkert,* 821 S.W.2d at 955–57; *Almanza v. State,* 686 S.W.2d 157, 171 (Tex.Cr.App.1984) (actual degree of harm from error in jury charge must be assayed in light of entire jury charge, state of the evidence,

gues there was no danger the jury convicted appellant of capital murder based on the transferred intent instruction because the jury found at the punishment phase in special issue one that "appellant deliberately caused the death" of the baby.[12]

We disagree. The jury actually found in the first special issue that appellant's conduct that caused the death of the baby was committed deliberately and with the reasonable expectation that the death of the deceased *or another* would result. Since special issue one focused on the deliberateness of the conduct that caused death and a reasonable expectation that the death of the deceased *or another* would result, we cannot say the jury found appellant specifically intended to kill the baby based on the jury's affirmative answer to special issue one. The first special issue contains a type of "transferred intent" provision since the jury could have affirmatively answered special issue one even if it believed appellant lacked the specific intent to kill the baby.

Therefore, we address whether Section 6.04(b)(2) applies to a capital murder prosecution under Section 19.03(a)(6)(A) which in-volves a question of legislative intent. See *Boykin v. State*, 818 S.W.2d 782, 785–86 (Tex.Cr.App.1991). Section 6.04(b)(2) provides:

"A person is nevertheless criminally responsible for causing a result if the only difference between what actually occurred and what he desired, contemplated, or risked is that: a different person or property was injured, harmed, or otherwise affected."

Section 19.03(a)(6)(A) provides that a person commits capital murder if he commits murder as defined in V.T.C.A., Penal Code, Section 19.02(a)(1), and murders more than one person during the same criminal transaction. Section 19.02(a)(1) provides that a person commits murder if he intentionally or knowingly causes the death of an individual. Section 19.03(a)(6)(A), therefore, requires two or more intentional or knowing murders.

The plain language of Section 6.04(b)(2) evinces a legislative policy to make a defendant, who, like appellant, acts with the specific intent to kill, criminally responsible for the consequences of his voluntary acts.[13] And,

---

including contested issues and weight of probative evidence, arguments of counsel and any other relevant information in the record).

The defensive issue at trial was whether appellant intended to kill the baby. The main contested issues of fact were whether appellant shot the baby more than once, whether the baby was on the bed when appellant fired the first shot, and when the mother began crying "my baby, my baby." The State's evidence shows the baby was on the bed when appellant fired the first shot, the baby was shot more than once, and the mother probably was incapable of saying anything when appellant claimed she began crying, "my baby, my baby." The baby suffered four initial penetration wounds; most of the mother's wounds were caused by fragments that first hit the baby. And, appellant told what the jury rationally could have concluded was a totally incredible story in light of this evidence. The prosecutor used the discrepancies between the forensic evidence and appellant's testimony to argue appellant was lying about accidentally killing the baby.

In addition, since the State's evidence shows the first fatal shot to the baby's head was nonfatal to the mother and appellant presented no other evidence that this shot also was fatal to the mother, the only evidence raising the transferred intent issue is appellant's testimony that he intended to kill only the mother when he shot the baby. Compare *United States v. Sampol*, 636

F.2d 621, 674 (D.C.Cir.1980) (former Chilean Ambassador to the United States and another person were killed by the same act when a bomb attached to the former ambassador's car was detonated to remote control). In other words, the jury would had to have believed appellant's testimony to convict him of capital murder under a transferred intent theory. Although the theory that appellant specifically intended to kill both victims is the theory best supported by the evidence, we note the prosecutor emphasized the transferred intent instruction during closing arguments and argued that even if the jury believed everything appellant said he still would be guilty of capital murder based on the transferred intent instruction. Cf. *Johnson v. State*, 739 S.W.2d 299, 302–05 (Tex.Cr.App.1987).

**12.** Under the law applicable to this case, special issue one asked:

"Was the conduct of the [appellant] that caused the death of [the baby] committed deliberately and with the reasonable expectation that the death of the deceased or another would result?"

**13.** We have noted the statutory first special issue contains a type of "transferred intent" provision which indicates a legislative policy to make this special issue applicable to a defendant in appellant's position. See *supra*.

this Court has held Section 6.04(b)(2) can be applied to establish a Section 19.02(a)(1) murder. See *Aguirre v. State*, 732 S.W.2d 320, 326 (Tex.Cr.App.1982) (op. on reh'g). Therefore, since Section 19.03(a)(6)(A) incorporates two or more Section 19.02(a)(1) murders and Section 6.04(b)(2) can be used to establish a Section 19.02(a)(1) murder, and in light of the legislative policy underlying Section 6.04(b)(2) and the statutory first special issue, we hold Section 6.04(b)(2) applies to a Section 19.03(a)(6)(A) capital murder prosecution.

Appellant relies on two California intermediate appellate court opinions which, in effect, hold the transferred intent doctrine should not be applied to a murder prosecution for the unintended victim where the defendant also kills the intended victim. See *People v. Czahara*, 203 Cal.App.3d 1468, 250 Cal.Rptr. 836 (1988); *People v. Birreuta*, 162 Cal.App.3d 454, 208 Cal.Rptr. 635 (1984). The rationale of these decisions appears to be that, in such a case, the defendant can be adequately punished for killing the intended victim so applying the transferred intent doctrine would not promote its purpose which is to "insure the adequate punishment of those who accidentally kill innocent bystanders, while failing to kill their intended victims." See *Birreuta*, 208 Cal.Rptr. at 638.

Here, however, the Texas Legislature intended to aggravate the punishment for multiple murders, like those herein, to that for a single capital offense. See, e.g., *Narvaiz v. State*, 840 S.W.2d 415, 432 (Tex.Cr.App.1992), cert. denied, — U.S. —, 113 S.Ct. 1422, 122 L.Ed.2d 791 (1993) (under Section 19.03(a)(6)(A), the aggravating circumstance making an "ordinary" murder a capital offense is the murder of a second person during the same criminal transaction). Therefore, the rationale in the California cases for not applying the transferred intent doctrine in a murder prosecution for the unintended victim where the intended victim also is killed is not applicable to a capital murder prosecution under Section 19.03(a)(6)(A). Were we to adopt the reasoning of appellant's position and the California cases, at least as applied to Section 19.03(a)(6)(A), the

result would be that a defendant, who intentionally murders his spouse and "accidentally" kills several bystanders, could *not* be prosecuted for capital murder because he murdered his intended victim. However, a defendant who with the intent to murder his spouse fails to murder his spouse but "accidentally" kills several bystanders could be prosecuted for capital murder, even though he killed less people than in the above hypothetical for which he could not be prosecuted for capital murder. The Legislature did not intend such anomalous results when it enacted Section 19.03(a)(6)(A). See Tex.Gov't Code, Section 311.021(3) (in enacting a statute, it is presumed that a just and reasonable result is intended); Tex.Gov't Code, Section 311.023(5) (in construing a statute, *whether or not the statute is considered ambiguous*, a court may consider the consequences of a particular construction).

Also, the California cases analyze California's common-law concept of transferred intent rather than a statute similar to Section 6.04(b)(2). Because the Texas Legislature has spoken on this subject in Section 6.04(b)(2), the policy considerations set out in the California cases are more appropriately left to our Legislature, and not the courts. And, the issue is not so well-settled in California since one of the cases appellant cites acknowledges at least one California intermediate appellate court going the other way on the issue. See *Czahara*, 250 Cal.Rptr. at 838.[14] We decline to frustrate the legislative intent in Section 6.04(b)(2) based on two California intermediate appellate court opinions analyzing California's common-law concept of transferred intent. Appellant's first and second points of error are overruled.

In his sixteenth point of error, appellant argues that because the State could not prove he specifically intended to kill the baby the evidence is insufficient to support an affirmative answer to the first special issue on "deliberateness." As we stated in our discussion of appellant's first and second points of error, the jury could have affirmatively answered special issue one even if it believed appellant lacked the specific intent to kill the baby. And, under the applicable

---

**14.** We also have found no California higher court authority settling the issue.

standard of review, the evidence outlined above is sufficient to support the jury's affirmative answer to special issue one. See *Huffman v. State*, 746 S.W.2d 212, 224 (Tex. Cr.App.1988). Appellant's sixteenth point of error is overruled.

■ Appellant's seventeenth point of error asserts the evidence is insufficient to support the jury's affirmative answer to special issue two.[15] The evidence at guilt-innocence shows appellant had threatened the mother with a pistol. He later killed her and her two-year-old baby with a high-powered deer rifle at close range in an apartment occupied by other family members. Appellant's ex-wife testified at the punishment stage that during their marriage appellant "knocked her around," was violent and threatened her with weapons. Appellant was physically abusive to her children and told her if they ever broke up he would take her two youngest children from her. She also stated she lived in fear that one day appellant would shoot her. Evidence that appellant committed a murder on Christmas day in 1979 also was introduced. An eyewitness to the murder testified the murder was unprovoked and the victim was unarmed. Appellant had been on parole for that murder for only about six months when he committed this offense. The evidence is sufficient to support the jury's affirmative answer to special issue two.

In support of his argument the evidence is insufficient, appellant relies on *Huffman*, *Beltran v. State*, 728 S.W.2d 382 (Tex.Cr. App.1987), and *Roney v. State*, 632 S.W.2d 598 (Tex.Cr.App.1982), each of which involved a murder committed during a robbery with the death sentences reformed to life on appeal because the evidence was insufficient to support the jury's affirmative answers to special issue one. Of course, no two cases

are alike. *Beltran*, 728 S.W.2d at 390. We find these cases distinguishable primarily because there was no showing in them that "murder or violence was originally intended." *Huffman*, 746 S.W.2d at 225; *Beltran*, 728 S.W.2d at 390; *Roney*, 632 S.W.2d at 601–03. Here, the evidence, viewed in the light most favorable to the verdict, shows that murder and violence were originally intended.

Appellant also argues the evidence is insufficient when the aggravating evidence is considered together with the evidence that he was upset after the killings; he did not kill others in the apartment even though he had an opportunity to do so; he immediately reported the offense to his mother, the police and his pastor; he expressed remorse; and he peacefully surrendered to the police and thereafter cooperated with them by giving a written statement. Appellant argues the evidence shows "he essentially committed a crime of passion while experiencing extreme emotional distress."[16] However, it was the jury's function to evaluate and weigh these factors; this Court does not sit as a thirteenth juror. Point of error seventeen is overruled.

■ Appellant's third point of error asserts the trial court erred in overruling his motion to suppress and admitting his confession because the State did not rebut appellant's testimony at the suppression hearing that he was told if the confession was true it would help him. See *Dunn v. State*, 721 S.W.2d 325, 341 (Tex.Cr.App.1986). The State argues appellant waived any error in the admission of the confession. We agree. The record reflects appellant affirmatively stated he had no objections when the State offered his confession into evidence during trial. Therefore, appellant waived any error. See *Jones v. State*, 833 S.W.2d 118, 126 (Tex.

---

15. Special issue two asked:
 "Is there a probability that the [appellant] would commit criminal acts of violence that would constitute a continuing threat to society?"

16. The jury did not have to accept this view of the evidence. Viewed in the light most favorable to the verdict, the evidence supports a finding that appellant intended violence and murder when he left his home with the deer rifle. The jury did not have to believe that appellant at-

tempted to call the mother on the phone, that he did not originally intend murder and violence, and that he knocked on the mother's door before he used the deer rifle on the mother and her baby. Under the State's theory, appellant intentionally and deliberately killed the baby in front of the mother to punish her for treating him badly, and then killed the mother as he had promised he would do if she "messed him over." The jury was entitled to accept this view of the evidence.

Cr.App.1992), cert. denied, —— U.S. ——, 113 S.Ct. 1285, 122 L.Ed.2d 678 (1993). Point of error three is overruled.

■ Appellant's fourth point of error asserts the trial court erred when it allowed the State to impeach his credibility with the nature of his prior felony conviction. On direct examination, appellant testified he previously had been convicted of a felony and sentenced to eight years. Over appellant's objection, the trial court allowed the State on cross-examination to elicit that appellant's prior felony conviction was for murder. The charge instructed the jury to use the prior murder conviction only on the issue of appellant's credibility and not as evidence of guilt.

Before testifying, appellant made the following objection:

"Well, Your Honor, see, in his speech there, he's getting beyond the purpose for which he's trying to introduce it. He's talking about intent and motive and all that. The purpose that [the prosecutor] first of all set out for which he's introducing this conviction is simply to impeach the credibility of [appellant]; that is, that because a person was convicted of a felony and he's a felon, it tends to make him not as trustworthy, under the law (sic). It's not whether he was convicted of a murder or a robbery or a theft or whatever. It's the fact that he's a felon. And there's no reason other than pure prejudice and inflammation that the State wants to get this murder part of the felony in for; so we're

asking the Court—the Court has already made the ruling that it's coming in; but I want to ask the Court to just strike the murder part of the felony conviction. There's no reason to do that, to get that in hand (sic). Then it so prejudices the jury on the present trial. This defendant has the right to be tried on the case that he's on trial for and not to be convicted because of his past criminal record."

The State advanced several reasons for admitting the nature of appellant's prior conviction. For example, the State claimed since appellant planned to take the stand and testify he did not intend to kill the baby his credibility on that question would be an important issue for the jury to decide, and the nature of appellant's prior conviction would be relevant to the issue of his credibility. The State also argued that since appellant was on trial for capital murder the jury could have used the nature of his prior conviction to determine that appellant had a motive to lie when he testified he accidentally killed the baby.[17]

On appeal, appellant claims the jury should not have been informed his prior felony conviction was for murder. Appellant argues the trial court failed to properly apply the balancing test in Tex.R.Crim.Evid. 609(a) in determining whether the probative value of admitting the nature of appellant's prior conviction outweighed its prejudicial effect. He claims that, since murder does not involve dishonesty, the nature of appellant's prior conviction had no probative value in assess-

17. "Your Honor, if the jury is going to properly evaluate the effect of the former felony, they have to know what it is. It's one thing to know that a pickpocket took somebody else's wallet and he's been convicted of theft from a person and quite a different thing that he's an armed hijacker. The defense is lack of intent to kill. We think the fact that he's already been convicted of an intentional offense is probative of his credibility of whether or not this was an intentional act. And they should know what he was convicted of so they may properly evaluate his testimony as to what he's got to lose, the (sic) see variety of the crime; for example, driving while intoxicated—they ought to know that. The type of offense for which you're convicted has varying weights upon your credibility. Your felony DWI is one thing; your *felony* pickpocket is another. If you have a second-degree felony possession for drugs or if you're charged with an intentional offense, an

assaultive offense, such as murder, for which he has been convicted, the jury needs to know that to weigh his credibility and also to know how much of a motive the guy has to lie in his testimony. The greater the type of offense, the greater the probability that he might not be telling the truth.

"Also, we're dealing here with issues of intent. It's an intentional crime; not a reckless crime such as a negligent homicide. The types of offenses for which you've been convicted is very probative and has weight as to your credibility. And we should be allowed to give that to a jury to make their decision.

"I feel the movement and flow of all of our law is to give the jurors the facts and let them deal with it. And I don't think we ought to handcuff them or blindfold them by not allowing them to properly evaluate the believability of this witness's testimony."

ing his credibility. Appellant argues this evidence was highly prejudicial because the offense for which he was on trial and the prior conviction both involved murder.

We must decide whether the trial court clearly abused its discretion in determining the probative value of the nature of appellant's prior murder conviction outweighed its prejudicial effect. See *Theus v. State*, 845 S.W.2d 874, 879–81 (Tex.Cr.App.1992). Here, appellant testified and made an issue of his intent to kill the baby. By doing so, he also made his credibility an issue for the jury to decide. The State's case on the issue of appellant's intent with respect to the baby was largely circumstantial as appellant's statements to his mother and the police after the killings were not necessarily inconsistent with his claim at trial he did not intend to kill the baby.

And, on this record, there is some merit to the State's argument at trial that the jury could have used the prior murder conviction to conclude appellant had a motive to lie. Appellant testified on cross-examination he believed the State would try all it could to make sure he got the death penalty, even suggesting the police may have tampered with the dead baby's body; therefore, it would not have been improper for the jury to use the prior murder conviction to conclude appellant had a motive to lie about his intent to kill the baby in order to escape the death penalty. See *Bustillos v. State*, 464 S.W.2d 118, 123 (Tex.Cr.App.1971) (a defendant should not be immunized from attacks on his credibility by proof of prior convictions because he keeps repeating the same offense).

In addition, the trial court instructed the jury to use the prior murder conviction only on the issue of appellant's credibility which lessened the prejudice. See *Robinson v. State*, 701 S.W.2d 895, 899 (Tex.Cr.App.1985). And, it would have been within the trial court's discretion to have concluded it would be less prejudicial to appellant for the jury to know the nature of the prior conviction than to speculate about it. We hold the trial court's decision to admit the nature of appel-

lant's prior conviction was within the "zone of reasonable disagreement." See *Theus*, 845 S.W.2d at 881.

 Finally, on this record, any error in admitting the evidence was harmless. The prosecutor elicited it at the beginning of cross-examination. The prosecutor did not mention it during closing arguments instead emphasizing the inconsistencies between the State's evidence and appellant's testimony. And, even this cold record reflects appellant made a major contribution to his conviction with testimony the jury rationally could have concluded was totally incredible in light of all the other overwhelming evidence to the contrary.[18] Point of error four is overruled.

Appellant's fifth point of error asserts the trial court erred in allowing the prosecutor to cross-examine appellant on how long he served in prison on his prior murder conviction because it was an improper comment on the parole laws. On cross-examination, the prosecutor asked appellant how much time he did on his eight year sentence for the murder conviction, and appellant answered, "Two years, nine months, and five days." The prosecutor responded by stating, "Two years, nine months, and five days out of eight?", to which appellant answered, "Yes, sir."

"Q. Aren't you the same person—Michael Wayne Norris—who was convicted of murder, on August 29, 1983, in the 174th District Court, in Cause No. 366535.

"A. Yes, sir.

"Q. How much time did you get for that?

"A. Eight years, sir.

"Q. When you killed [the mother and the baby], how long had you been out of prison?

"A. Right at six months.

"Q. How much time did you do on that eight years?

"A. Two years, nine months, and five days.

"Q. Two years, nine months, and five days out of eight?

---

18. The record reflects appellant chose to testify at guilt-innocence contrary to his lawyers' ad-

vice.

"A. Yes, sir."

Appellant then objected.

■■■ To preserve a complaint for appellate review, a timely objection must be made. See Tex.R.App.Proc. 52(a). Failure to make a timely objection waives the error unless the error is so prejudicial that an instruction to disregard could not have cured the error. See, e.g., *Hollins v. State,* 805 S.W.2d 475 (Tex.Cr.App.1991). An objection is timely if it is made as soon as the ground of objection becomes apparent. See *Thompson v. State,* 691 S.W.2d 627 (Tex.Cr.App.1984), cert. denied, 474 U.S. 865, 106 S.Ct. 184, 88 L.Ed.2d 153 (1985). Here, appellant did not object until after the prosecutor elicited the testimony; the State even repeated appellant's response before an objection was made. And, any error was not so prejudicial that an instruction to disregard could not have cured the error. In addition, appellant opened the door on the length of his sentence when he testified on direct that he had been convicted of a felony and sentenced to eight years. Point of error five is overruled.

In his sixth and seventh points of error, appellant asserts the trial court erred by refusing to allow him to rebut the State's closing arguments. The record reflects that at both stages of trial the State waived its opening argument, appellant argued, and the State closed. Appellant requested, but was denied, the opportunity to rebut the State's arguments. Appellant perfected bills of exceptions showing what he would have argued had he been permitted to answer the State's arguments.

The applicable statute is Article 36.07, V.A.C.C.P., which provides:

"The order of argument may be regulated by the presiding judge; but the State's counsel *shall have the right to make the concluding address to the jury.*"

Relying on out of state cases and a law review article, appellant argues the trial court's failure to allow him to rebut the State's arguments rendered his trial fundamentally unfair. This Court has resolved appellant's contentions adversely to him. See, e.g., *Martinez v. State,* 501 S.W.2d 130, 132 (Tex.Cr.App.1973), *appeal dism'd for want of a substantial federal question,* 415 U.S. 970, 94 S.Ct. 1547, 39 L.Ed.2d 863 (1974); *Young v. State,* 374 S.W.2d 891, 892 (Tex.Cr.App.1964). In addition, appellant has failed to demonstrate how his trial was fundamentally unfair. See Tex.R.App.Proc. 74(f). And, based on our review of appellant's bills of exceptions, we are not persuaded the trial court's failure to allow appellant to rebut the State's closing arguments made his trial fundamentally unfair. Appellant's sixth and seventh points of error are overruled.

■■■ In points of error eight and nine, appellant argues the trial court erred by failing to declare a mistrial when the prosecutor accused defense counsel of extortion (point nine) and of being unethical and a liar (point eight). Before cross-examining a witness at the guilt-innocence stage, appellant asked for a few minutes to examine a report which he possibly implied the prosecutor had just furnished to him that day, and the prosecutor objected by stating:

"... I'm going to object to that. That's false. We showed the entire file to this defense lawyer in my office months ago; and I object to anybody coming in here and saying that, because it's a lie.

"... if this man comes in here and says, 'We've never seen it or haven't seen it for months,' although they have seen it on several occasions? I object to that. It is grossly improper. It is unethical. It leaves a false impression of this in front of this jury, and I don't like it; I object to it."

Appellant objected to these remarks, asked the court for an instruction to disregard, and moved for a mistrial. The instruction to disregard was given; the motion for mistrial was denied.

During the punishment stage, appellant was explaining to the court that he had one more witness who was not present when the prosecutor objected and stated, "Your Honor, we're not up to extortion today. We will properly object to anything this lawyer wants to announce that would be hearsay to him and ask the Court to rule on it." Appellant objected to the use of the word "extortion," asked the court for an instruction to disregard, and moved for a mistrial. The instruc-

tion to disregard was given; the motion for mistrial was denied.

The State argues appellant failed to preserve error by failing to get a ruling on his objections. Appellant argues it makes no difference whether he got a ruling on his objections because the prosecutor's remarks were so improper that an instruction to disregard could not have cured error. Appellant also argues the prosecutor's remarks were intolerable especially in a capital murder case where a person's life is at stake, and we agree. However, on this record, we hold the trial court's instructions to disregard the prosecutor's comments were sufficient to cure error. The prosecutor's comments were isolated, and the trial court promptly instructed the jury to disregard them. See *Hendricks v. State*, 640 S.W.2d 932, 939 (Tex. Cr.App.1982) (prosecutor's numerous objectionable sidebar remarks during trial cured by prompt instruction to disregard); *Rodriquez v. State*, 552 S.W.2d 451, 454–55 (Tex. Cr.App.1977) (prosecutor's objectionable remark during the defendant's cross-examination of a State's witness cured by prompt instruction to disregard).

We find most of the cases upon which appellant relies distinguishable primarily because the improper comments in them occurred during closing arguments which is the last thing the jury hears before it begins deliberations; in those cases, this Court held an instruction to disregard could not have cured the error. See *Bell v. State*, 614 S.W.2d 122, 123 (Tex.Cr.App.1981); *Cook v. State*, 537 S.W.2d 258, 261–62 (Tex.Cr.App. 1976); *Lewis v. State*, 529 S.W.2d 533, 534 (Tex.Cr.App.1975); *Anderson v. State*, 525 S.W.2d 20, 22–23 (Tex.Cr.App.1975); *Lopez v. State*, 500 S.W.2d 844, 846 (Tex.Cr.App. 1973); *Bray v. State*, 478 S.W.2d 89, 90–91 (Tex.Cr.App.1972). We find the other case upon which appellant relies distinguishable because the objectionable comments occurred throughout the trial tainting the entire proceedings. See *Fuentes v. State*, 664 S.W.2d 333, 335–38 (Tex.Cr.App.1984). Points of error eight and nine are overruled.

■ Appellant's tenth point of error asserts the trial court erred in failing to declare a mistrial when the prosecutor commented on appellant's right of appeal. The record reflects that as the prosecutor was offering some photos of the dead baby into evidence in lieu of other photos, which appellant claimed were too inflammatory, the prosecutor stated:

"We will withdraw those [photos] and ask that the Court seal them away from the jury but include them in the appellate record so that the Court of Appeals, I hope, may see that the State of Texas is not trying to unduly inflame the jury but is in fact, doing its duty and proving what it's required to prove: the specific intent of the defendant to kill in this particular case."

Appellant objected and asked the trial court to instruct the jury to disregard the prosecutor's reference to the appellate court. The instruction to disregard was given; the motion for mistrial was denied.

Appellant cites several cases that have been reversed because of statements by prosecutors to the jury leading it to believe the ultimate responsibility for determining the appropriateness of a defendant's death sentence rested with an appellate court. See e.g., *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). That did not happen here. Moreover, the trial court's instruction to disregard was sufficient to cure any error. Appellant's tenth point of error is overruled.

■ Appellant's eleventh point of error alleges the trial court erred in permitting the prosecutor to inject the application of the parole laws into his summation at the punishment phase of trial. On appeal, appellant complains of the following emphasized portion of the prosecutor's closing argument:

"So you send [appellant] up there [to prison]. As he testified, *he did two years, nine months, and five days.* He came back and, within six months, killed two more people. You tried to rehabilitate him, and look at the price you paid for it. Look at his gratitude to society for giving him a chance—a chance at rehabilitation, a chance to live his life. He put a gun on innocent children, helpless women. For

what? Embarrassing him. He didn't like it." "

Appellant did not object to the argument; however, he argues no objection was required because the argument was so prejudicial that an instruction to disregard could not have cured the error. See *Romo v. State*, 631 S.W.2d 504 (Tex.Cr.App.1982).

We hold the argument was a reasonable deduction from the evidence, and the jury would not necessarily have taken the argument as an invitation to consider the application of the parole laws. See *Todd v. State*, 598 S.W.2d 286, 296–97 (Tex.Cr.App.1980). Taken in context, the prosecutor's argument was intended to convey to the jury appellant was beyond rehabilitation which is a reasonable deduction from the evidence that appellant killed two more people after serving approximately two and one-half years in prison for committing another murder. Moreover, contrary to the representation in appellant's brief, the prosecutor's argument did not mention appellant received an eight year sentence, and he served less than one-half of that sentence when he was released from prison. The jury would not necessarily have taken the prosecutor's argument as an invitation to consider the application of the parole laws. Under these circumstances, an instruction to disregard could have cured any error. Therefore, appellant waived any error. Appellant's eleventh point of error is overruled.

■ Appellant's twelfth point of error asserts the trial court erred in permitting the prosecutor during summation at the punishment phase to argue that if the jury did not impose the death penalty and appellant killed again the jury would be responsible. Appellant complains of the emphasized portions in the following argument:

"You know, I don't want to offend you when I say this; I just ask you to consider it. And it's not an accusation. But with the knowledge you've got now in your hands as jurors from all the way back to 1979 all the way up to 1987—the tracks of violence, the threats, the gunfire, the blood—*if you don't do something about this and he kills again, aren't you just a little bit responsible?* Think about it.

Now you've got your chance to stop it and to do something. You've got the evidence. You've got the law. He's had a fair trial. You know about prior rehabilitation attempts. *If you don't stop him and he does it again, you had the chance to stop him. What are you going to do then? You will have had some responsibility, possibly. I'm not going to say blood on your hands. But it will be more difficult to wash them.*" (Emphasis added)."

Appellant's thirteenth point of error asserts the trial court erred during summation at the punishment phase in permitting the prosecutor to argue that if the jury did not impose the death penalty for a defendant who killed two persons, no other jury could ever impose the death penalty on a defendant who killed one person. Appellant complains of the emphasized portions in the following argument:

"The question is this, ladies and gentlemen: When you render your verdict you are making a public statement; and it has an effect upon the group, whoever hears it. Think about the effect upon the criminals now in jail. They will read about it in the paper, wherever they hear about it. The defendant tells them about it. And look at all he did: He shot a baby four times and shot a woman to pieces while on parole for a murder in which he got off lightly. Isn't that going to agitate and cause more of the same among the population that would do this? I submit there's a higher duty here with your verdict. *Think about this: What are we going to say to the other killers who come before you and say, 'Look, folks, I went to kill one person in the robbery and I'm wrong. I wasn't on parole for murder. How are you going to give me a death sentence? You let that guy off with all he did. People get death sentences for less than this. Is that fair?'* "

Appellant did not object to either of these arguments; however, he contends both arguments were so improper that an instruction to disregard could not have cured the error. Appellant argues both arguments induced the jury to disregard its duty to return a verdict based solely on the law and evidence

and to decide the punishment issues based on collateral matters. He also argues the complained-of argument in point of error twelve was improper because it sought to hold the jury personally accountable for appellant's future conduct if he was spared the death penalty.

We hold the complained-of portions of the arguments, taken in context, were proper pleas for law enforcement. See *Luna v. State*, 461 S.W.2d 600, 601 (Tex.Cr.App.1970) (no reversible error in prosecutor's argument that "people that have such ideas in this county in the future will be put on notice that the citizens of this county are not going to put up with it"); *Hudson v. State*, 453 S.W.2d 147, 148 (Tex.Cr.App.1970) (no reversible error in prosecutor's argument asking the jury whether it was "going to be a part of the answer to crime in Harris County, Texas or a part of the problem"). Moreover, any error in the foregoing arguments could have been cured by an instruction to disregard. See *Long v. State*, 823 S.W.2d 259, 267 (Tex.Cr.App.1991), cert. denied, —— U.S. ——, 112 S.Ct. 3042, 120 L.Ed.2d 910 (1992). Therefore, appellant waived any error.

In support of his argument an instruction to disregard could not have cured the error, appellant relies on *Everett v. State*, 707 S.W.2d 638 (Tex.Cr.App.1986), and *Cortez v. State*, 683 S.W.2d 419 (Tex.Cr.App.1984). *Everett* is distinguishable because the prosecutor invited the jury to speculate on other damaging evidence that was not presented at trial. *Id.*, 707 S.W.2d at 640–41. *Cortez* is distinguishable because the prosecutor encouraged the jury to heed the demands, desires or expectations of the community. *Id.*, 683 S.W.2d at 421. Appellant's twelfth and thirteenth points of error are overruled.

■ Appellant's fourteenth point of error alleges he is entitled to a new trial because the cumulative impact of the prosecutor's repeated improper remarks, which are the subject of points of error five and eight through thirteen, denied appellant a fair trial. Appellant argues he was denied a fair trial because:

"In the course of a one week trial, the prosecutor improperly accused defense counsel of being unethical, dishonest and a liar (R. I–137–38) and of engaging in extortion (R. V–48); commented on appellant's appellate rights (R. II–461–62); proved and then argued the application of the parole law (R. II–561–63; R. V–87); argued that the jurors would be responsible if they spared appellant from the death penalty and he killed again (R. V–90); and, argued that if the jury did not impose the death penalty on appellant, who had killed two persons while on parole for murder, no jury could properly impose a death penalty on a defendant who killed only one person (R. V–97–98)."

We disagree. In our discussion of the foregoing points of error, we found error only in point eight, the prosecutor accusing defense counsel of being unethical and a liar at the guilt-innocence stage, and point nine, the prosecutor accusing defense counsel of extortion at the punishment phase. We held these errors were cured by the trial court's prompt instruction to disregard.

On this record, any errors complained of in this point of error that may have occurred at guilt-innocence were harmless. During summation at guilt-innocence, the prosecutor mostly emphasized the inconsistencies between the State's evidence and appellant's testimony. During summation, the prosecutor mentioned the time appellant spent in prison in the context of a proper argument that appellant was beyond rehabilitation, and the prosecutor avoided commenting on the other objectionable matters. Any error in the prosecutor's comments at guilt-innocence made no contribution to appellant's conviction or punishment.

■ Any errors complained of in this point of error that may have occurred at punishment also were harmless. During summation at punishment, the prosecutor made no disparaging remarks about appellant's lawyers and again emphasized the evidence from guilt-innocence and the evidence of appellant's prior murder conviction. Appellant's fourteenth point of error is overruled.

■ Point of error fifteen alleges the trial court erred at the punishment phase in

admitting evidence of an extraneous murder appellant allegedly committed, because the State failed to connect appellant to the murder.[19] At the punishment phase, the State sought to prove appellant committed the murder of Louie Ardis on December 25, 1979. A pen packet was admitted into evidence showing that on August 23, 1983, appellant was convicted of a murder that occurred on December 25, 1979, and appellant was sentenced to eight years.[20]

Ardis' former fiancee, Delajandro, testified that on December 25, 1979, she saw a black man shoot an unarmed Ardis. However, she was not asked to identify appellant as the person who murdered Ardis. The State presented no other evidence connecting appellant to this offense. Appellant made no objections at trial that the State failed to connect appellant to Ardis' murder. At summation, the State mentioned the details of the Ardis murder in support of its argument for an affirmative answer to special issue two.

On appeal, appellant argues we should excuse his failure to object because he had no viable remedy once it became apparent the State could not link him to the Ardis murder. He argues that moving to strike Delajandro's testimony would have been too little and too late. He argues we should analyze this issue as if he had objected, had the objection sustained, had the jury instructed to disregard, had a motion for mistrial denied, and then complained on appeal of the trial court's failure to grant the mistrial.[21]

We disagree. This case presents a good example of why the rules generally require a

party to object to preserve error for appeal. See Tex.R.App.Proc. 52(a); Tex.R.Crim. Evid. 103(a)(1). One reason these rules require an objection is to give the trial court or the other party an opportunity to correct the error or remove the basis of the objection. See, e.g., *Butler*, 872 S.W.2d at 239. Here, had appellant objected, the State could have removed the basis of the objection by presenting additional proof, and, if it could not do that, then the trial court could have stricken the testimony depriving the State of the opportunity of arguing it to the jury during summation. Therefore, an objection by appellant would not necessarily have been too little and too late. In addition, on this record, it appears the prosecutor may have believed appellant stipulated to his identity in the Ardis murder since appellant stated he would stipulate to "whatever else they want." This is another reason appellant should have objected since the prosecutor may have been under the impression appellant's identity in the Ardis murder was a nonissue. Under these circumstances, we hold appellant's failure to object waived error. See *Harris v. State*, 827 S.W.2d 949, 961 (Tex.Cr.App.), cert. denied, —— U.S. ——, 113 S.Ct. 381, 121 L.Ed.2d 292 (1992). Appellant's fifteenth point of error is overruled.

▆▆▆ Appellant's eighteenth point of error alleges Article 37.071, V.A.C.C.P., as applied, violates the Eighth Amendment to the Federal Constitution and Article I, Section 13 of the Texas Constitution because the special issues unduly limited the jury's consideration of relevant mitigating evidence.[22]

---

19. Article 37.071, V.A.C.C.P., allows admission of extraneous offenses at the punishment phase of a capital murder case if the State clearly proves the defendant committed them. See, e.g., *Butler v. State*, 872 S.W.2d 227, 239 (Tex.Cr.App. 1994).

20. The record reveals the State and appellant stipulated that appellant, Michael Wayne Norris, was the same Michael Wayne Norris who, on August 29th, 1983, in Cause No. 366535 in the 174th District Court of Harris County, Texas, was convicted of murder. At that time defense counsel stated, "We will stipulate to that, Your Honor. *At this time we stipulate that it's the same person and whatever else they want.*" (Emphasis supplied).

21. The State argues appellant waived error by failing to object to the State's "technical failure" to more thoroughly link up the murder observed by Delajandro with the one shown in the pen packet. There is no such thing as a "technical failure" to prove an issue a party has the burden of proving.

22. In his brief, appellant provides no substantive analysis and argument in separate grounds on how the protection provided by the Texas Constitution differs from the protection provided by the Federal Constitution; therefore, only appellant's federal constitutional claim is before this Court. See *Heitman v. State*, 815 S.W.2d 681, 690–91 fn. 23 (Tex.Cr.App.1991); *Morehead v. State*, 807 S.W.2d 577, 579 fn. 1 (Tex.Cr.App.1991).

See *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). In *Penry*, the defendant was entitled to an additional special issue because the other special issues placed beyond the effective reach of the jury the relevant mitigating qualities of the defendant's evidence of mental retardation that rendered him unable at the time of the offense to appreciate the wrongfulness of his conduct or to conform his conduct to the law. *Penry*, at 308, 109 S.Ct. at 2941. This evidence was relevant mitigating evidence because of the long-held belief by society "that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." See *Penry*, at 319, 109 S.Ct. at 2947. The special issues placed the mitigating qualities of this evidence beyond the jury's effective reach because it could not be determined for sure whether the jury could have given "appropriate" mitigating effect to the evidence in answering special issue one and the jury could have given the evidence only aggravating effect in answering special issue two. See *Johnson v. Texas*, —— U.S. ——, —— – ——, 113 S.Ct. 2658, 2667–70, 125 L.Ed.2d 290 (1993); *Penry*, 492 U.S. at 322–24, 109 S.Ct. at 2949.

*Johnson* reaffirmed the rule that as long as relevant mitigating evidence is within "the effective reach of the sentencer" the requirements of the Eighth Amendment are satisfied. *Johnson*, —— U.S. at ——, 113 S.Ct. at 2669. *Johnson* rejects the position that a defendant is entitled to a *Penry* charge whenever he offers evidence with some arguable relevance "beyond the scope of the special issues." *Johnson*, at ——, 113 S.Ct. at 2671. (*Penry* was not meant to require a jury to give possible effect to mitigating evidence "in every conceivable manner in which the evidence might be relevant"). Because the special issues allow a jury to exercise a wide range of discretion about the severity of the crime and the defendant's culpability, *Penry* requires us to determine " 'whether there is a reasonable likelihood that the jury has applied the challenged instruction[s] in a way that prevents the consideration of constitutionally relevant evidence.' " See *Johnson*, at ——, 113 S.Ct. at 2669–70. We should evaluate the instructions with a " 'common-sense understanding of the instruction[s] in the light of all that has taken place at trial.' " See *id.*, at ——, 113 S.Ct. at 2669.

Appellant relies on the following evidence of the circumstances surrounding the offense:

"1) The shooting was a crime of passion arising out of a quasi-domestic quarrel.

"2) Appellant was emotionally distraught at the time of the offense. [The mother] had embarrassed him in front of the church security guard, repeatedly hung up the telephone when he called her and refused to talk to him when he came to her apartment. Appellant was depressed as a result of the problems in their relationship, and at the time of the offense, lost control as a result of his extreme emotional distress."

We hold any mitigating qualities of this evidence was within the effective reach of the jury in answering both special issues. See *Joiner v. State*, 825 S.W.2d 701, 704 (Tex.Cr. App.1992), cert. denied —— U.S. ——, 113 S.Ct. 3044, 125 L.Ed.2d 729 (1993) (in answering special issue two, the jury may consider, among other things, the calculated nature of the defendant's acts, the forethought and deliberateness exhibited by the crime's execution, and whether the defendant was acting under duress).

Appellant relies on the following evidence of his conduct immediately after the offense:

"1) Appellant had the opportunity to shoot the mother's sons but did not do so even after one of the sons threw a tire iron at him.

"2) Appellant went home in tears and told his mother what he had done.

"3) Appellant immediately called the police and reported the offense.

"4) Appellant called his pastor and expressed remorse.

"5) Appellant went outside his parents' home at the dispatcher's request and peacefully surrendered to the police, and was cooperative.

"6) Appellant gave a written statement acknowledging responsibility.

"7) Appellant was remorseful and 'very sorry' for his conduct in connection with the offense."

Appellant also relies on the following evidence of his positive character traits:

"1) Appellant had been a good student in school.

"2) Appellant had always been active in his church. He attended regularly since age six, sang in the choir as a youth and drove the church bus as an adult.

"3) Appellant was a good father to his seven-year-old daughter, and had treated the baby like his own son.

"4) Appellant had always maintained regular employment. He was gainfully employed at the time of the offense and was considered a good employee."

We have held evidence, like that set out above, requires no separate *Penry* instruction. See *Muniz v. State*, 851 S.W.2d 238, 256 (Tex.Cr.App.1993), cert. denied, — U.S. —, 114 S.Ct. 116, 126 L.Ed.2d 82 (1993); *Ex parte Harris*, 825 S.W.2d 120, 121–22 (Tex.Cr.App.1991); *Boggess v. State*, 855 S.W.2d 645, 656 (Tex.Cr.App.1991) (opinion on remand from U.S. Supreme Court); *Ex parte Baldree*, 810 S.W.2d 213, 216–17 (Tex. Cr.App.1991). Point of error eighteen is overruled.

 Appellant's nineteenth point of error alleges his death sentence must be reformed to life imprisonment because the trial court failed to submit a special issue at the punishment stage as to whether appellant deliberately killed the mother. Appellant argues Article 37.071(f), V.A.C.C.P.,[23] is unconstitutional under the Fifth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 13 and 19, of the Texas Constitution to the extent it requires a finding of deliberateness only as to one victim in a Section 19.03(a)(6)(A) prosecution.[24]

We disagree. Under Section 19.03(a)(6)(A) and Article 37.071(f), a defendant is "death-eligible" if he knowingly or intentionally and "deliberately" kills one person, and he knowingly or intentionally kills another person during the same criminal transaction. We hold this scheme satisfies the requirements of the Eighth Amendment by sufficiently narrowing the class of death-eligible defendants. See *Johnson v. State*, 853 S.W.2d 527, 533 (Tex.Cr.App.1992), cert. denied, — U.S. —, 114 S.Ct. 154, 126 L.Ed.2d 115 (1993).

Appellant also argues Article 37.071(f) is unconstitutional, as applied to him, under an application of *First v. State*, 846 S.W.2d 836 (Tex.Cr.App.1992). We disagree. In *First*, the second named victim in the indictment smashed the defendant's head into a sidewalk and a car bumper just before the defendant killed him and the first named victim in the indictment. *Id.*, 846 S.W.2d at 837. In *First*, we held Article 37.071(f) was unconstitutional as applied to the defendant because the special issues placed beyond the jury's effective reach the relevant mitigating evidence of the provocation of the second named victim in the indictment. *Id.*, 846 S.W.2d at 837–42. Here, there is no evidence of any provocation, like what occurred in *First*, by either the mother or the baby. Therefore, *First* does not apply. Appellant's nineteenth point of error is overruled.

The judgment of the trial court is affirmed.

MALONEY, J., concurs in the result.

CLINTON, Judge, concurring.

Judge Baird maintains in his concurring opinion that we need not address the merits of the issue appellant raises in his first two points of error regarding application of V.T.C.A. Penal Code, § 6.04(b) to the facts of the instant case. I agree. Nevertheless, without explanation the majority addresses

---

**23.** At the time of trial, Article 37.071(f) read: "If a defendant is convicted of an offense under Section 19.03(a)(6), Penal Code, the court shall submit the three issues under Subsection (b) of this article only with regard to the conduct of the defendant in murdering the deceased individual first named in the indictment."

**24.** In his brief, appellant provides no substantive analysis and argument in separate grounds on how the protection provided by the Texas Constitution differs from the protection provided by the Federal Constitution; therefore, only appellant's federal constitutional claim is before this Court. See *Heitman*, 815 S.W.2d at 690–91 fn. 23; *Morehead*, 807 S.W.2d at 579 fn. 1.

the issue anyway, and I cannot readily dismiss the majority's disposition as *obiter dictum*, as Judge Baird does. I therefore write separately.

## I.

The trial court charged the jury abstractly on the law of transferred intent as set out in § 6.04(b)(2), supra, *viz:*

"A person is ... criminally responsible for causing a result if the only difference between what actually occurred and what he desired, contemplated, or risked is that a different person or property was injured, harmed, or otherwise affected."

In the application paragraph the trial court then authorized the jury to find, essentially, that if it found appellant, intending to cause the death of Georgia Rollins, caused the death of her child instead, it could find him criminally responsible for causing the child's death. The trial court further instructed the jury that should it find appellant also intentionally caused Georgia's death, it could convict appellant of capital murder under former V.T.C.A. Penal Code, § 19.03(a)(6)(A), now § 19.03(a)(7)(A).

If the evidence showed conclusively that appellant killed both Georgia and the child in a single act, I would agree that we were confronted in this case with the issue the majority addresses, *viz:* whether under § 6.04(b) the State may in effect use the same intent twice, both to authorize a finding that appellant murdered Georgia, whom he specifically intended to kill, and did, and also to authorize a finding that he murdered the child, whom he did not specifically intend to kill, but did, and thus obtain a capital conviction for multiple murder. Under the bizarre facts of this case, the evidence might support a finding that appellant killed both mother and child in a single shot, notwithstanding that later shots were fired. However, the evidence also supports a theory that, intending to kill Georgia, appellant first inadvertently caused the death of the child, and then shortly after, in a separate act, he intentionally killed Georgia. I agree with Judge Baird that under this scenario, the same intent was not used twice. Instead, appellant's intent to kill Georgia with the first shot

was transferred to render him culpable for the death he did cause, the child's. When he subsequently fired again, intending to kill, and actually killing, Georgia, he committed a second act by which he became criminally responsible for her murder too. Given this theory of the case, the State was entitled to an instruction on transferred intent because the jury needed to know that it was entitled to find appellant murdered the child with the first shot even though he had intended to kill Georgia instead.

Appellant could have requested an instruction to the jury that, should it find from the evidence that he caused the deaths of both Georgia and the child with a single shot, it could not rely on the doctrine of transferred intent for any purpose. Had appellant requested such an instruction, and the trial court denied it, then the issue that the majority addresses would be squarely presented: Does § 6.04(b) authorize using the same intent twice when a single act by the accused causes both the result intended, and another, unintentional result that would constitute an offense if he *had* intended it? Instead, appellant objected globally that the jury should not be instructed on the law of transferred intent at all. In my view this was an insufficiently specific objection to present the issue the majority purports to resolve today. Tex. R.App.Proc., Rule 52(a). Thus the error appellant raises on appeal has not been preserved. That is all the majority need say.

## II.

Judge Baird reasons that because the majority could have disposed of appellant's transferred intent argument without reaching the merits, the majority's treatment of the merits constitutes *obiter dictum*. While nothing would please me more than to believe that the gloss the majority places upon § 6.04(b), supra, is not an authoritative one, I simply cannot agree with Judge Baird that it is *dictum*. *Obiter dictum* is "[w]ords of an opinion entirely unnecessary for the decision of the case." Black's Law Dictionary, at 1072 (6th ed. 1990). The majority disposes of appellant's transferred intent argument by construing § 6.04(b) to allow the jury to use the same intent both to hold the accused

criminally liable for the result he intended, and did in fact cause, and to hold him liable for the result he did not intend, but inadvertently caused. The majority offers no additional or alternative resolution to appellant's transferred intent argument. The only rationale that the majority proposes is its construction of § 6.04(b). That construction is therefore entirely necessary to the majority's disposition of the appeal. It is in no sense *obiter dictum.* Unlike Judge Baird, I feel compelled to address it.

The majority first concludes that § 6.04(b) may be applied in a prosecution for capital murder under § 19.03(a)(6)(A), supra. Majority op. at 441. This is an unremarkable conclusion. There is no language of limitation in either provision to indicate otherwise. Next, the majority proceeds to reject appellant's argument that § 6.04(b) "should not be applied to a murder prosecution for the unintended victim where the defendant also kills the intended victim." Majority op. at 441. It is here that the majority's analysis, such as it is, goes astray.

First the majority divines that the purpose of the transferred intent doctrine, as gleaned from several California cases, is to insure that criminal offenders do not escape the full brunt of the law simply because they cause a condemnable result different than the one they set out to cause. The California cases reason that, if the offender actually does cause the result he intended, he may be punished adequately for that offense. Ancillary criminal liability for any other result he may have caused, out of recklessness or negligence, may also be imposed, of course. There is simply no need to apply any notion of "transferred" intent to punish the defendant to the full extent his culpable *mens rea* would seem to call for. Majority op. at 441. From this premise, the majority distinguishes, *viz:*

> "Here, however, the Texas Legislature intended to aggravate the punishment for multiple murders, like those here, to that for a single capital offense. * * * Therefore, the rationale in the California cases for not applying the transferred intent doctrine in a murder prosecution for the unintended victim where the intended victim is

also killed is not applicable to a capital murder prosecution under Section 19.03(a)(6)(A)."

Majority op. at 441. With all due respect, this is, to put it in the best light, a complete *non sequitur.* At worst, it totally begs the question.

Nobody denies that in § 19.03(a)(6)(A) the legislature meant to criminalize as a capital offense the "murder" of more than one person during the same criminal transaction. The question here, however, is whether both killings during the same transaction may be considered "murder" for purposes of this provision where the killer only ever intended to kill one person, and only incidentally caused another to die as well. This constitutes capital murder only if the single murderous intent will serve to elevate both homicides to the level of "murder." Thus we are left with the question that we began with: Does § 6.04(b) authorize using the self-same intent-to-kill to make both homicides—both the intentional one *and* the one not specifically intended—"murders" for purposes of § 19.03(a)(6)(A)? The majority simply assumes that it does.

Rather than try to conjure "anomalous" consequences of a construction it clearly does not prefer, majority op. at 441, the majority would do better to focus first on the language of § 6.04(b) itself. Where the meaning of a statutory provision is plain on its face, we are obliged to effectuate that meaning unless to do so leads to absurd results. *Boykin v. State,* 818 S.W.2d 782, at 785 (Tex.Cr.App. 1991). On its face § 6.04(b) applies only when there is a "difference between what actually occurred and what [the accused] desired, contemplated or risked[.]" It deems an accused "criminally responsible" to a level commensurate with the offense he "desired, contemplated, or risked" whenever "the only difference between" that offense and "what actually occurred" is that "a different offense was committed" or "a different person or property was injured, harmed, or otherwise affected." Section 6.04(b) does *not* provide, however, that if "what actually occurred" was *both* the offense "desired, contemplated, or risked" *and an additional* offense that was not specifically intended, then the State may

prosecute the accused for the unintended offense at the same level of criminal responsibility at which it will *also* prosecute him for "the desired, contemplated or risked" offense. The provision does not speak of "additional" offenses, but of "different" ones.

Nor does this plain reading of § 6.04(b) reap absurd results. The Legislature may well have intended that in a multiple homicide situation, where the killer only intentionally or knowingly caused the death of one of his victims, the killer should be prosecuted dually for murder and some other lesser homicide, but not for capital murder. Surely it is not hard to credit a legislative judgment that such a scenario does not call for the most extreme remedy at its disposal. The majority clearly favors a construction of § 6.04(b) that would render such a killer eligible for the death penalty under § 19.03(a)(6)(A), supra. The best indicator of legislative intent, however, is the plain language of § 6.04(b) itself. That a majority of this Court prefers a different construction than the plain language affords is no basis to reject the apparent legislative intent as absurd.

For this reason I can only concur in the result the majority reaches. I cannot join its ill-considered, and in any event, gratuitous, rationale.

BAIRD, Judge, concurring.

In points of error one and two appellant contends the evidence was insufficient to support his conviction because the doctrine of transferred intent does not apply to the instant case. *See,* Tex.Penal Code Ann. § 6.04(b)(2). The majority holds the doctrine of transferred intent applies when the defendant kills a bystander as well as the intended victim. I write separately because I believe the majority's expansive discussion of this issue is unnecessary.

In the instant case, appellant shot at the mother intending to kill her. However, the bullet hit and mortally wounded the infant. Although the shot also injured the mother, her wound was not fatal. After the infant's death, appellant entered the room and continued to shoot the mother. Appellant left the room, returned and shot the mother again. The evidence is clear the mother was mortally wounded by a subsequent shot, after the infant was killed.[1]

Appellant was convicted of murdering more than one person during the same criminal transaction. Tex.Penal Code Ann. § 19.03(a)(6)(A).[2] Tex.Penal Code Ann. § 19.02(a)(1) provides that a person commits murder if he "intentionally or knowingly causes the death of an individual." Thus, the State's burden in the instant case was to prove appellant had the specific intent to kill both victims. *Id.*

A defendant may not avoid criminal responsibility simply because the person killed was not the intended victim. The doctrine of transferred intent, codified at Tex.Penal Code Ann. § 6.04(b)(2), provides:

(b) A person is nevertheless criminally responsible for causing a result if the only difference between what actually occurred and what he desired, contemplated, or risked is that:

\*　　\*　　\*　　\*　　\*　　\*

(2) a different person or property was injured, harmed, or otherwise affected.

An illustration of the doctrine of transferred intent is found in *Williams v. State,* 567 S.W.2d 507 (Tex.Cr.App.1978). The defendant and several others were visiting at a friend's residence. The defendant stood and pointed a pistol at Cook. Another friend, Busby, entered the room. The defendant shot at Cook but the bullet struck Busby. The defendant was convicted of the attempted murder of Busby. *Id.,* 567 S.W.2d at 507–508. On appeal the defendant contended the evidence was insufficient to demonstrate he specifically intended to cause Busby's death and that the doctrine of transferred intent (§ 6.04(b)(2)) did not apply to Tex.Penal Code Ann. § 19.02(a)(1). *Williams,* 567

---

1. Appellant's testimony establishes that he shot the infant once and then shot the mother. The State's case indicates that both the infant and the mother suffered several gun shot wounds.

2. In 1993, the Legislature expanded the acts which constitute capital murder under Tex.Penal Code Ann. § 19.03. § 19.03(a)(6) is now found at § 19.03(a)(7).

S.W.2d at 508–509. We held the defendant's intent to kill Cook was presumed when he fired the pistol. Under § 6.04(b)(2) that intent was sufficient to support a conviction for the attempted murder of Busby. *Williams,* 567 S.W.2d at 509. *See also, McNeal v. State,* 600 S.W.2d 807 (Tex.Cr.App.1980) (Tex.Penal Code Ann. § 6.04(b)(2) applies to prosecutions under Tex.Penal Code Ann. § 19.02(a)(1)); *and, Aguirre v. State,* 732 S.W.2d 320 (Tex.Cr.App.1982) (Opinion on Rehearing) (Doctrine of transferred intent applies to prosecutions under Tex.Penal Code Ann. § 19.02(a)(3).).

Consequently, under the doctrine of transferred intent, § 6.04(b)(2), appellant is criminally responsible for the infant's death. However, appellant contends the evidence is nevertheless insufficient to support a conviction under Tex.Penal Code Ann. § 19.03(a)(6). Specifically, appellant contends he lacked the intent to cause the death of the mother because that intent had been transferred to the infant. Appellant argues that it is improper to transfer the intent to cause the mother's death to the infant, and, retain that intent to prove the mother's murder.

Appellant correctly argues that we have never addressed this issue, and invites us to adopt the reasoning of two cases from the Courts of Appeal in California. *People v. Birreuta,* 162 Cal.App.3d 454, 208 Cal.Rptr. 635 (5th Dist.1984); *and, People v. Czahara,* 203 Cal.App.3d 1468, 250 Cal.Rptr. 836 (1st Dist.1988). In these cases the Courts reasoned:

> The purpose of the transferred intent rule—to ensure that prosecution and punishment accord with culpability—would not be served by convicting a defendant of two or more attempted murders for *a single act* by which he intended to kill only one person.

*Czahara,* 250 Cal.Rptr. at 839 (emphasis added).

---

**3.** Judge Clinton believes the majority's discussion of this issue is more than *obiter dictum* because of the manner in which the majority frames and resolves the issue. *Ante,* at 434. I disagree. Regardless of the manner in which the issue is framed and resolved, the facts remain the same;

We should decline appellant's invitation to determine the correctness of this reasoning because it is *not* applicable to the instant case. When appellant realized he had killed the infant but not the mother, appellant continued to shoot and eventually killed the mother. Thus, the murders were *not* committed in "a single act." Consequently, appellant was criminally responsible for both murders and the doctrine of transferred intent was not impermissibly expanded.

On the other hand, the majority accepts appellant's invitation, considers those cases but holds that such reasoning, when applied to § 19.03(a)(6) would lead to "anomalous results." *Ante* at 441. Because the majority's discussion of that issue is not essential to the resolution of the instant case it is merely *obiter dictum.*[3]

With these comments I join only the judgment of the Court.

the murders were *not* committed in "a single act." Consequently, the majority's discussion of transferred intent, as it relates to two murders in "a single act," is not *essential* to resolve this point of error.